ENVIRONMENTAL DEFENSE FUND,
INC., et al., Appellants,

v.

Robert F. FROEHLKE, Secretary of the
Army, et al., Appellees.

No. 72–1427.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 18, 1972.

Decided Dec. 14, 1972.

Richard S. Arnold, Texarkana, Ark., for appellants.

Glen R. Goodsell, Atty., Dept. of Justice, Washington, D. C., for appellees.

G. D. Walker, Jonesboro, Ark., for intervenor.

Before HEANEY and STEPHENSON, Circuit Judges, and BOGUE,* District Judge.

HEANEY, Circuit Judge.

The primary question raised on this appeal is whether an environmental impact statement, filed by the Corps of

* Sitting by designation, District of South Dakota.

Engineers in connection with the Cache River—Bayou DeView Channelization Project, complied with the National Environmental Policy Act of 1969.[1] Secondary questions are whether the project violates the Water Bank Act of 1970,[2] the Fish and Wildlife Coordination Act,[3] or 33 U.S.C. § 701a. The trial court answered the first question in the affirmative and the latter questions in the negative. We reverse and remand.

## FACTS

The Cache River Basin comprises 2,030 square miles of bottom lands in northern Arkansas and southern Missouri. The predominate economic activity in the area is agriculture, but the basin contains prime habitat for game, fish and wildlife, thousands of acres of hardwood bottom lands and other swamp lands having rare natural aesthetic quality. Severe floods have occurred in the basin since 1916 causing millions of dollars of damage to farms and urban areas.

By the Flood Control Act of 1950,[4] Congress authorized construction of the project. Planning funds were regularly appropriated from 1963 to 1971. In July, 1969, a general design for the project was completed. It called for clearing, realigning, enlarging, and re-channeling approximately one hundred forty miles of the Cache River upstream from its junction with the White River, fifteen miles of its upper tributaries, and seventy-seven miles of its principal tributary—the Bayou DeView, for flood control and drainage purposes. The project was estimated to cost the federal government forty-three million dollars.

In 1971, specific plans were completed for the first phase of the project. In July of that year, a contract was let to clear and excavate 6.7 miles of the lower Cache River to relieve backwater flooding. Two million dollars for this phase of construction was appropriated for fiscal 1972 and 1973.[5]

On December 7, 1970, the Corps of Engineers filed a final environmental impact statement with respect to the project.

On September 24, 1971, a draft environmental statement was filed by the Corps. This statement discussed a "mitigation plan" to purchase thirty thousand acres of land in the basin to mitigate the wildlife losses.

On October 6, 1971, the plaintiffs filed an action seeking to halt construction of the project. Construction was voluntarily postponed by the Corps to permit the trial court to consider the matter.

On May 12, 1972, the trial court filed a final judgment in favor of the defendants. Construction was undertaken immediately.

## ADEQUACY OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT

Section 102(C) of NEPA requires the Corps to "[i]nclude in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement" which discusses the impact of the action on the environment.

The final impact statement, filed on December 7, 1970, is not sufficiently detailed to meet the standards of the Act. It is too vague, too general and too conclusionary. Thus, it cannot form a basis for responsible evaluation and criticism.

1. 42 U.S.C. § 4321 et seq.

2. 16 U.S.C. §§ 1301–1311.

3. 16 U.S.C. § 662.

4. 64 Stat. 172.

5. Supplemental Appropriations Act of 1973, P.L. 92–607 (October 31, 1972); Public Works for Water and Power Development and Atomic Energy Commission Appropriation Act, 1973, 86 Stat. 621, approved August 25, 1972; Public Works for Water and Power Development and Atomic Energy Commission Appropriation Act, 1972, 85 Stat. 364, approved October 5, 1971.

The statement does not meet the guidelines laid down by the Council on Environmental Quality or the Corps itself.[6]

The most significant failure of the December 7 impact statement is its unsatisfactory discussion of alternatives to channelizing the Cache River. Section 102(C)(iii) of NEPA specifically requires that the impact statement discuss "[a]lternatives to the proposed action."

In this case, a number of alternatives to the proposed project have been suggested by responsible critics, including state and federal agencies and private groups and individuals. These alternatives include (1) acquisition of public lands to mitigate the loss of public access to forest and wildlife resources,[7]

(2) flood plain zoning,[8] (3) crop insurance,[9] (4) outright purchase of the fee title to or a flowage easement over the lands in the flood plain,[10] and (5) four plans consisting of various combinations of diversions, floodways, reservoirs, interceptor ditches and levees.[11]

While some of these alternatives were mentioned in the impact statement and others set forth by including letters received by those who had suggested them, none were discussed in detail by the Corps.

This treatment of alternatives is insufficient. Section 102(G) of NEPA states that the Corps should "[i]*nitiate* and utilize ecological information in the planning and development of resource-

6. The Council on Environmental Quality's Interim Guidelines in effect when the Corps' December 7 impact statement was prepared may be found at 35 Fed.Reg. 7390 (April 30, 1970). CEQ's most recent guidelines may be found at 36 Fed. Reg. 7724 (April 23, 1971). The Corps' guidelines in effect when the statement was prepared are found at EC 1120-2-56 and appendixes (September 25, 1970). The Corps' most recent guidelines may be found at ER 1105-2-507 (January 3, 1972) and appendixes. See, Environmental Guidelines for the Civil Works Program, November 23, 1970.

The Corps states that while its December 7, statement does not comply with current standards for the preparation of an impact statement, it does comply with the standards in effect when this statement was prepared and should be evaluated by the latter standards. In our opinion, however, the December 7 statement is inadequate under either set of standards.

7. Those who have suggested that a mitigation plan should be formulated and included as part of the project are the Arkansas Game and Fish Commission, the Arkansas Soil and Water Conservation Commission, Dale Bumpers (Governor of Arkansas), the United States Department of Agriculture Forest Service, the Department of the Interior Fish and Wildlife Service, the Secretary of the Interior and the Arkansas Planning Commission.

The December 7 impact study itself concludes that "[t]he most desirable alternative to the project as presently

formulated would be the inclusion of additional features to prevent or mitigate fishery and wildlife losses." The statement, however, states:

"The alternative of modification of the project to provide additional mitigation measures is under active consideration. The District Engineer is proceeding with studies that will make a current assessment of the overall project effects on fish and wildlife habitat and will determine the extent additional measures for mitigation of such losses are needed which are beyond our present authorities."

8. This alternative has been suggested by the Arkansas Game and Fish Commission, and the United States Department of the Interior.

9. This alternative was suggested by Leo Eisel, a professional water resource planner, in an affidavit submitted at trial.

10. This alternative was suggested by Leo Eisel. The United States Department of the Interior also suggested this alternative as part of a mitigation plan.

11. The December 7, 1970, impact statement states, with respect to these plans:

"Four alternate plans consisting of various combinations of diversions, floodways, reservoirs, interceptor ditches and levees were studied in detail. One of these plans was recommended by the U. S. Fish and Wildlife Service as a means of reducing fish and wildlife losses. None of the plans were feasible, either from an economic or engineering viewpoint."

oriented projects." And § 102(D) of NEPA mandates that the Corps:

> "Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;"

The guidelines of the CEQ state that the impact statement should include:

> " * * * A rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse environmental effects is essential. * * * "

Statements on Proposed Federal Actions Affecting the Environment: Interim Guidelines § 7(a)(iii), 35 Fed.Reg. 7390, et seq., April 30, 1970. Accord, Statements on Proposed Federal Actions Affecting the Environment: Guidelines § 6(a)(iv), 36 Fed.Reg. 7724, et seq., April 23, 1971. And the Corps own guidelines stated that the statement should

> " * * * Discuss the unavoidable adverse effects and the implications thereof, and identify the abatement or mitigation measures proposed to rectify these and the extent of their effectiveness. * * * "

EC 1120–2–56 App. B § 5(d), September 25, 1970.

Furthermore,

> "[t]he legislative history suggests that the Congress * * * expect[ed] the 102 statement to record the agency's tradeoffs of competing values. In explaining the bill on the Senate floor, Senator Jackson said:

> " 'Subsection 102(c) (now 102(2)(C)) establishes a procedure designed to insure that in instances where a proposed major Federal action would have a significant impact on the environment that the impact has in fact been considered, *that any adverse effects which cannot be avoided are justified by some other stated consideration of national policy*, that short-term uses are consistent with long-term productivity, *and that any irreversible and irretrievable commitments of resources are warranted.'* [115 Cong.Rec. 29055 (October 8, 1969)]" (Emphasis included.)

Council on Environmental, Quality, Environmental Quality 245 (1972).

To fulfill these mandates, the impact statement should not just list the alternatives to the proposed project but it should also include the results of the Corps' own investigation and evaluation of alternatives so that the reasons for the choice of a course of action are clear.

■ The Corps argues that despite these omissions, its impact statement should be considered sufficient because "at every step of the way, from preauthorization studies through detailed project planning, which includes recent environmental and mitigation studies, the voices of fish and wildlife interests have been heard, considered and reported to Congress." We disagree. Nothing less than a complete impact statement can serve the important purposes of § 102(C)(iii) of NEPA. As the District of Columbia Circuit Court stated in Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 834 (D.C.Cir. 1972), "it is the essence and thrust of NEPA that the pertinent Statement serve to gather in one place a discussion of the relative environmental impact of alternatives." Section 102(C) of NEPA requires that copies of the statement "shall be made available to the President, the Council on Environmental Quality and to the public * * * and shall accompany the proposal through the existing agency review processes." A statement which includes a detailed discussion of all reasonable alternatives to a proposed project and their effects, see, Natural Resources Defense Council, Inc. v. Morton, *supra* at 834, insures that agency officials will be acquainted with the tradeoffs which will have to be made if any particular line of action is chosen. A complete impact study is an

integral part of the "careful and informed decision-making process." See, Calvert Cliffs Coord. Com. v. United States A.E. Com'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

■■ The complete impact statement must contain more than a catalog of environmental facts, however. The agency must also "explicate fully its course of inquiry, its analysis and its reasoning." Ely v. Velde, 451 F.2d 1130, 1139 (4th Cir. 1971). Thus, the complete formal impact statement represents an *accessible* means for opening up the agency decision-making process and subjecting it to critical evaluation by those outside the agency, including the public.

Finally, the formal impact statement supplies a convenient record for courts to use in reviewing agency decisions on the merits to determine if they are in accord with the substantive policies of NEPA. To hold that the piecemeal presentation of environmental views to Congress over a period of approximately twenty-five years may be substituted for a complete environmental impact statement would rob the statement of much of its efficacy as an action-forcing mechanism.[12]

■ The Corps also argues that it was not necessary to discuss in greater detail the alternative of acquiring land to mitigate the loss of natural resources because this alternative was a separate project requiring separate Congressional authorization. We disagree.

The proposed mitigation plans go to the very heart of the question before the Corps in preparing its environmental impact statement—whether the project should proceed at the present time in view of its environmental consequences. Responsible critics [13] of the project have urged that no project be initiated *until a mitigation plan is actually put into effect* in order to prevent easily avoidable environmental losses. They state that following the commencement of construction, it will become difficult—if not impossible—to acquire suitable land for mitigation because of increased property values and the continued clearing of land for cultivation. Thus, in their view, any mitigation proposal is inextricably

12. The Corps' most recent guidelines recognize the importance of the impact statement:

"1. *General.* Preparation of environmental statements will be based on considerations discussed in the CEQ Interim Guidelines and the detailed guidance to follow. These directions are intended to assure consistency of effort in preparing statements and are not proposed to induce unthinking uniformity or limit flexibility when preparing the statements. These statements have several levels of importance with reference to the decision-making process, Corps relations with the public, and internal project planning activities. A careful, objective detailing of environmental impacts, alternatives, and implications of a proposed project should give reviewers both within and outside the Corps insight into the particular trade-offs and commitments associated with the action. The general public, environmental action groups, trade and special interest associations, governmental agencies, and Congressional Committees will all expect the statements to be a valid source of information on project effects, as well as a reflection of how the agency views environmental factors and seeks to accommodate them. Since the statements will be made available to the public and may receive broad exposure in the media, it can be assumed that they will receive careful scrutiny. Most importantly, preparation of the statements should cause systematic consideration of environmental impacts. An imaginative evaluation of alternatives and their implications should begin in the earliest stages of project formulation, with planners contemplating the criteria and range of information to be employed in preparation of final statements."

This is substantially in accord with the views expressed in EC 1120–2–56, App. B, Sec. 1, September 25, 1970.

13. These include the United States Secretary of the Interior, the regional office of the Fish and Wildlife Service (Bureau of Sport Fisheries and Wildlife), the Arkansas Planning Commission, the Arkansas Game and Fish Commission, and the Governor of Arkansas.

linked to the project itself. Such a view is not clearly without merit.[14]

Yet the Corps has provided no evaluation or analysis of the costs and benefits of delayed construction. This failure is contrary to the guidelines of the CEQ which state:

> " * * * Sufficient analysis of such alternatives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects."

Interim Guidelines § 7(a)(iii), *supra.* Accord, Guidelines § 6(a)(iv), *supra.*

Here, neither agency decision-makers, such as the Chief of Engineers or the Secretary of the Army, nor the Congress were presented in the impact study with sufficient information to make an intelligent decision about proceeding with the project or awaiting the effectuation of a mitigation plan. Thus, the statement did not insure that the option of mitigation would not be prematurely foreclosed.

In addition, we see no practical reason why the Corps could not have included in its final impact statement a thorough exploration of the possibility of mitigation in order to give decision-makers an opportunity to consider the possibility of delaying construction until a mitigation plan was put into effect. There is no suggestion that speed is of the essence in this project. It has already waited approximately twenty-five years. Furthermore, mitigation measures have been suggested by government agencies, at least since 1959. This is not a case where a previously unthought of or implausible alternative suddenly becomes practical because of the development of new sources of information or new technology.[15]

While the December 7 impact statement fails to meet the standard of detail required by NEPA in other respects besides the discussion of alternatives, we think it unnecessary to discuss these at the present time. Subsequent to the District Court's decision in the present case, we decided Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, 470 F.2d 289 (8th Cir. 1972), in which we approved the decision of Judge Eisele in the *Cossatot* case.[16] We think that the opinions of Judge Eisele in that case, along with the current guidelines of CEQ and the Corps, provide sufficient guidance for the preparation of a new impact statement.

## JUDICIAL REVIEW OF SUBSTANTIVE MERITS

We held in Environmental Defense Fund, Inc. v. Corps of Engineers

---

14. That plaintiffs' fears may have a basis in fact is supported by the following colloquy before the District Court:

"Q. [Mr. Palmer, attorney for the plaintiffs] Has the Memphis District of the Corps of Engineers ever, in fact, acquired any mitigation lands in respect of any of these other channelization projects? A. [Colonel Parish, Corps of Engineers] No, sir, we have not.

"Q. Again, if you know, why is that? How did that come to pass? A. We obtained authorization for acquiring some 6,000 acres of wildlife habitat in the St. Francis Basin several years ago. However, between the time we had selected the land for authorization and the time we received the authorization, the lands were cleared and under cultivation. * * *"

15. As noted above, the Corps has prepared a draft impact statement relating to a proposed mitigation plan which would result in the acquisition of 30,000 acres. This proposal is still undergoing administrative review within the agency. Congress included a mitigation plan for the project in the Flood Control Act of 1972 (S. 4018). This Act was vetoed by President Nixon on October 27, 1972.

16. The opinions in the *Cossatot* case may be found at: Environmental Defense Fund v. Corps of Eng. of United States Army, 325 F.Supp. 728 (E.D.Ark.1971); Environmental Defense Fund, Inc. v. Corps of Eng. of United States Army, 325 F.Supp. 749 (E.D.Ark.1971); Environmental D. Fund, Inc. v. Corps of Eng. of United States Army, 342 F.Supp. 1211 (E.D.Ark.1972).

of the United States Army, *supra* at 397, that District Courts have an obligation to review substantive agency decisions on the merits to determine if they are in accord with NEPA.

The review is a limited one for the purpose of determining whether the agency reached its decision after a full, good faith consideration of environmental factors made under the standards set forth in §§ 101 and 102 of NEPA; and whether the actual balance of costs and benefits struck by the agency according to these standards was arbitrary or clearly gave insufficient weight to environmental factors. Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, *supra*.

We caution, as we did in Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, *supra* at 300, that:

" * * * Although this inquiry into the facts is to be searching and care-

ful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

The Corps concedes that a limited review is generally available but argues that review on the merits is not proper in this case because Congress appropriated money for the project after an impact statement was filed.[17] The Corps reasons that the decision of Congress to fund the project under these circumstances makes the decision to complete the project a Congressional one not subject to review by the courts. We disagree.

NEPA requires that construction projects be completed in accordance with its substantive provisions.[18] An appropriation act cannot serve as a vehicle to

---

17. The Corps concedes, however, that if we find, as we do, that the impact statement is unsatisfactory, the case must be reversed and remanded in order for the Corps to prepare a new impact study even if Congressional funds had been appropriated. See, Committee for Nuclear Responsibility v. Seaborg, 463 F.2d 783, 785 (D.C. Cir. 1971) ; Environmental Defense Fund, Inc. v. Corps of Eng. of United States Army, *supra* at 325 F.Supp. 763.

18. Section 102(2) of NEPA requires *all* agencies of the federal government to consider environmental factors in reaching decisions.

Senate Report 91–296, 91st Congress, 1st Session (1969), states in part:

"1. * * * Virtually every agency of the Federal Government plays some role in determining how well the environment is managed. Yet, many of these agencies do not have a mandate, a body of law, or a set of policies to guide their actions which have an impact on the environment. * * *

"Section 101 of S. 1075 rectifies this by providing a congressional declaration that it is the continuing policy and responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal planning and activities to

the end that certain broad national goals in the management of the environment may be attained.

"2. * * * But, if goals and principles are to be effective, they must be capable of being applied in action. S. 1075 thus incorporates certain 'action-forcing' provisions and procedures which are designed to assure that *all* Federal agencies plan and work toward meeting the challenge of a better environment." (Emphasis added.)

Mr. Henry M. Jackson, the principal Senate sponsor of NEPA, stated:

" * * * If an environmental policy is to become more than rhetoric, and if the studies and advice of any high-level, advisory group are to be translated into action, each of these agencies must be enabled and directed to participate in active and objective-oriented environmental management. Concern for environmental quality must be made part of *every phase* of Federal action." (Emphasis added.)

115 Cong.Rec. 29087 (1969).

The guidelines of the Council on Environmental Quality state:

"4. *Federal agencies included.* Section 102(2)(C) applies to *all agencies* of the Federal Government with respect to recommendations or reports on proposals for (i) legislation and (ii) other major Federal actions significantly af-

change that requirement. Rule XXI of the House of Representatives is specific in this regard. It provides:

"2. No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless in continuation of appropriations for such public works and objects as are already in progress. *Nor shall any provision in any such bill or amendment thereto changing existing law be in order, * * * ".* (Emphasis added.)

L. Deschler, Manual and Rules of House of Representatives, 92nd Congress, H.R. Doc.No.439, 91st Cong., 2nd Sess. 464–465 (1971).[19]

---

fecting the quality of the human environment. The phrase 'to the fullest extent possible' in section 102(2)(C) is meant to make clear *that each agency* of the Federal Government shall comply with the requirement unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible. (Section 105 of the Act provides that 'The policies and goals set forth in this Act are supplementary to those set forth in existing authorizations of Federal agencies.')"
36 Fed.Reg. 7724, et seq. (1971) (Emphasis added.)

Congress has specifically indicated that the provisions of NEPA are applicable to construction agencies. See, S.Rep. 91–118, 91st Cong., 2nd Sess. (1970). In this case, flood control projects are under the jurisdiction of and are prosecuted by the Department of the Army with the supervision of the Chief of Engineers. 33 U.S.C. § 701b. The decisions of the Corps of Engineers figure importantly in the planning of flood control projects. See, 33 U.S.C. § 701, et seq. The project, which included Gillham Dam, was authorized according to the recommendations of the Corps. 72 Stat. 309 (1958). Before a dam is constructed or modified, its plans must be submitted to the Chief of Engineers and the Secretary of the Army, and approved by them. 33 U.S.C. § 401. Small flood control and shore restoration projects may be undertaken by the Corps without specific Congressional approval. 33 U.S.C. § 426g; 33 U.S.C. § 701s. We see no reason why its action should not be as subject to judicial review as that of any other agency. In making recommendations, evaluating plans and constructing projects, the Corps must give *appropriate weight* to all environmental values.

The Corps itself has recognized this, stating:

" * * * In formulating plans for Federal water resource development or management activities, impact on the environment will be fully considered from the initiation of preauthorization planning through postauthorization planning and design, construction, and operation management. * * *

* * * * *

" * * * During Corps of Engineers project planning and the related decision making process, a systematic and interdisciplinary approach will be utilized to insure that proper weighing and balancing has been made of environmental impacts together with the technical economic and social aspects as well as all other considerations affecting the total public interest. * * * "
ER 1105–2–507, §§ 4, 4b, January 3, 1972. See, Environmental Guidelines for the Civil Works Program of the Corps of Engineers, November, 1970.

19. The commentary to this part of Rule XXI states that "the rule was first adopted in 1837, to prevent delay of appropriation bills because of contention over propositions of legislation." L. Deschler, Manual and Rules of House of Representatives, 92nd Congress, H.R.Doc.No. 439, 91st Cong., 2nd Sess. 464–465 (1971). The commentary also points out that:

"The provision of the rule forbidding in any general appropriation bill a 'provision changing existing law' is construed to mean the enactment of law where none exists, or a proposition for repeal of existing law. * * * "
*Ibid.* at 470.

Rule 16.4 of the Standing Rules of the Senate contains an analogous provision:
"No amendment which proposes general legislation shall be received to any general appropriation bill, nor shall any amendment not germane or relevant to the subject matter contained in the bill be received; nor shall any amendment to any item or clause of such bill be received which does not directly relate thereto; nor shall any restriction on the expenditure of the funds appropriated which proposes a limitation not authorized by law be received if such restriction is to take effect or cease to be effective upon the happening of a

Moreover, the appropriation act for fiscal 1971 was accompanied by a Senate Report which stated in part:

"The committee has received objections, based on environmental grounds, to many programs and projects for which funds are included in this bill. The objections are principally based on the failure of the agencies involved to file the five-point statement required by the National Environmental Policy Act of 1969. The agencies were given until June 1, 1970, to prepare their procedures for implementing that act. The committee has been informed that the required statements are in preparation. In most cases, the projects objected to have been under construction for some time. *The fact that the committee has recommended funds in this bill does not exempt the construction agencies from complying with the provisions of that act as currently applicable.*" (Emphasis added.)

S.Rep. 91–118, 91st Cong., 2nd Sess. (1970).

The appropriation acts for fiscal 1972 and 1973 were not accompanied by similar reports, but that fact is immaterial in the light of House Rule XXI, *supra*, and the general rule against repeal by implication.[20] Thus, legislators voting for bills appropriating funds for this project had the right to assume that the project would be carried out in accordance with the substantive provisions of NEPA.

Our conclusion that the District Court has an obligation to provide a substantive review here is supported by the decision of the United States Court of Appeals for the D.C. Circuit. Committee for Nuclear Responsibility v. Seaborg, 463 F.2d 783, 785 (D.C.Cir.1971). There, the Court stated:

" * * * There is, of course, nothing inconsistent with the adoption of *appropriations* and *authorization* measures on the *pro tanto* assumption of validity, while leaving any claim of invalidity to be determined by the courts. * * * " (Emphasis added.)

■ Our holding is not as broad as that of the D.C. Circuit in *Seaborg.* We simply hold that an appropriation act cannot change the requirements of NEPA. We recognize that Congress has the right to *authorize* projects and to exempt them from the provisions of NEPA, but Congress did not take such action here. No new authorization bill was passed after NEPA was enacted. The only authorization for the project was voted years before NEPA was passed.

## ALLEGED VIOLATIONS OF THE WATER BANK ACT OF 1970 AND THE FISH AND WILDLIFE COORDINATION ACT

The plaintiffs contend that the trial court erred in dismissing counts of the complaint which alleged violations of the above Acts. We do not agree.

■ The Water Bank Act sets up a leasing program for the preservation of wetlands to be administered by the Agriculture Department. It does not purport to establish enforceable standards which must be followed by all government agencies in construction projects.

contingency; and all questions of relevancy of amendments under this rule, when raised, shall be submitted to the Senate and be decided without debate; and any such amendment or restriction to a general appropriation bill may be laid on the table without prejudice to the bill."
G. Harrison & J. Coder, Senate Manual, S. Doc. No. 92–1, 92nd Cong., 1st Sess. 18 (1971).

The Senate rule differs from the House rule in that it is limited to amendments to appropriation bills. This limitation exists apparently because traditionally the House has assumed the power to originate such bills. Congressional Quarterly, Guide to the Congress of the United States, 185–186 (1971).

20. See, Committee for Nuclear Responsibility v. Seaborg, *supra* at 463 F.2d 785.

The Fish and Wildlife Coordination Act, on the other hand, does require governmental agencies, including the Corps, to coordinate their activities so that adverse effect on fish and wildlife will be minimized. But as Judge Eisele said in Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749, 754 (E.D.Ark.1971) (the *Cossatot* case), if the Corps complies with NEPA in good faith, it will "automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require them to do both separately."

### ALLEGED VIOLATION OF 33 U.S.C. § 701a

The plaintiffs finally contend that the trial court erred in dismissing their fifth claim for relief which alleges that the Corps is violating 33 U.S.C. § 701a by proceeding with the project. Section 701a is a preamble to the Flood Control Act of 1936. It states:

> " * * * the Federal Government should improve or participate in the improvement of navigable waters or their tributaries, including watersheds thereof, for flood-control purposes if the benefits to whomsoever they may accrue are in excess of the estimated costs, and if the lives and social security of people are otherwise adversely affected. * * *"

The complaint specifically alleges that the costs exceed the benefits for this project and that the lives of people would be adversely affected by the project's completion. However, this project was authorized many years ago by Congress on the basis of its determination that the benefits of the project exceed the costs. We do not think that the statement of policy in § 701a can be used as a vehicle for continuing evaluation of the project by the courts.

We point out, however, that the relief requested by the plaintiffs under § 701a is partially available under NEPA. To fully comply with NEPA, the Corps must reappraise the costs and benefits of the project in light of the policies of environmental protection found in NEPA. As we have stated, a decision to proceed with channelization is reviewable in the District Court to determine whether the actual balance of costs and benefits struck by the agency according to the standards of §§ 101 and 102 of NEPA was arbitrary or clearly gave insufficient weight to environmental factors.

### REMEDIES

We remand this case to the District Court with instructions to it:

(1) to require the Corps to submit a revised impact statement in accordance with the decision of Judge Eisele in the *Cossatot* case and in accordance with the current guidelines of CEQ and the Corps itself;

(2) to retain jurisdiction of the matter to rule on the sufficiency of the new environmental impact statement if a prompt request for such review is made;

(3) to review the agency decision in light of the arbitrary and capricious test if a prompt request for such review is made; and

(4) to grant such injunctive relief as the court may feel is appropriate.[21]

Reversed and remanded.

---

21. It appears that work on the initial phase of channelization is almost complete. No future contracts for the project will be awarded until 1974. We, therefore, leave to the trial court the necessity for injunctive relief.