Arthur M. NELSON et al., Plaintiffs,

v.

Earl L. BUTZ, Individually and as Secretary of Agriculture of the United States, et al., Defendants.

Civ. No. 5–74–7.

United States District Court, D. Minnesota, Fifth Division.

June 6, 1974.

**820**

Howard J. Vogel, Minneapolis, Minn., for plaintiffs.

U. S. Atty. Donald F. Paar, Minneapolis, Minn., Norman J. Loren, Co. Atty., Kanabec County, Mora, Minn., for defendants.

## MEMORANDUM AND ORDER

HEANEY, District Judge, Sitting by Designation.

The plaintiffs bring this action seeking a declaratory judgment and injunctive relief. They allege that an environmental impact statement (EIS) prepared by the United States Department of Agriculture Soil Conservation Service (SCS), regarding the construction of a dam on the Knife River, failed to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, and the Guidelines for Preparation of Environmental Impact Statements prepared by the Council on Environmental Quality (CEQ) and published in 38 Fed.Reg. 20549 (August 1, 1972).[1] Hence, plaintiffs ask the Court to declare that the EIS fails to comply with the statute and guidelines, and enjoin defendants permanently from constructing the dam until such time as they comply with the law. This Court has jurisdiction under 28 U.S.C. § 1331.

The Knife River is located in east central Minnesota, and the proposed dam is to be constructed near Mora, Minnesota, in Kanabec County. The proposed dam is to replace a dam which was constructed in 1929. That dam failed in July of 1972, as a result of an unusually heavy rainstorm of some eight to ten inches. Considerable property damage resulted from this failure. An initial temporary dam also failed and the present temporary dam was constructed a few hundred yards downstream of the old dam, in the fall of 1972, to approximately the previously established elevation of the lake. The proposed dam is to be located approximately one mile downstream of the old dam and will raise the water level of the reservoir eighteen inches and enlarge the lake area from 1,145 acres to 1,277 acres.[2] While the EIS states that the present temporary dam is susceptible to failure, the evidence developed at trial indicates that the near term potential for such failure is slight.[3]

The plaintiffs allege:

(1) That the EIS does not comply with § 102(C) of NEPA (42 U.S.C. § 4332(C)) in that it does not adequately disclose and discuss the impact and adverse environmental effects of the proposed action on certain aspects of the environment: "the land and environs located below the proposed dam site; the archeological site above the proposed dam site; the wild life and wetland habitat above and below the proposed dam

---

1. The guidelines are applicable to all draft and final impact statements filed with the CEQ after January 28, 1973. The guidelines appear in the Code of Federal Regulations in Title 40, Chapter V, at Part 1500. Subsequent citations will be to the Code.

2. The 1929 dam enlarged the natural size of the lake from 400 acres to 1,145 acres.

3. A rainstorm of the magnitude of the July, 1972, storm (a hundred-year event) would, of course, present a serious problem.

site; the irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented; the discussion of the feasibility of alternatives and the implementation of such alternatives to the proposed action; the discussion of the feasibility of remedial steps with respect to the environmental impact of the proposed action; and the balance of environmental impact, benefits and commitment of resources in a cost-benefit analysis as required by NEPA."

(2) That some statements in the EIS are not supported by data and that others are based on inadequate data.

(3) That the commenting procedure utilized by the SCS in the preparation of the EIS violates the provisions of NEPA in that the public was not given an adequate opportunity to comment on the draft environmental impact statement.

(4) That the defendants failed to make an adequate response to the comments of those who did comment on the impact statement.

The National Environmental Policy Act requires that all agencies of the federal government shall:

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

■ While it is obvious that every particular detail in its most minute aspect cannot be evaluated and considered, where particularly unique aspects are affected, the EIS should note them in some detail.

■ The Court finds that the EIS adequately discloses and discusses the environmental effect of the project on the land and environs located above and below the proposed dam site and the wildlife and wetland habitat above and below the proposed dam site, with the following exceptions:

(1) The EIS does not adequately disclose and discuss environmental effects of the project on mature white pines located on Big Island and Knife Lake.

(2) The EIS does not adequately disclose and discuss effects of the inundation of some of the islands on Knife Lake.

■ The Court does not consider that the general statements in the EIS indicating that there would be an impact on trees and islands as a result of the raising of the water level meets the requirement of NEPA with respect to the above matters. These statements are too general to conform with the Act or the guidelines.

While agencies are encouraged by the law and regulations to convey the required information succinctly in a form easily understood (40 C.F.R. § 1500.-8(b)) and to avoid "highly technical and special analysis" (40 C.F.R. § 1500.-8(a)(1)), they must analyze unique and unusual environmental aspects of the project in the EIS. General descriptions of unique aspects of the project can, of course, be used if backup data is attached as appendices or is included by reference with adequate bibliographic references (40 C.F.R. § 1500.8(a)(1)).

This is not to say that the EIS must list every tree, bird, fish and shrub as

the plaintiffs have urged. General descriptions, when supported by appropriate backup data, will suffice and such data should be attached as appendices or footnoted with adequate bibliographic references. 40 C.F.R. § 1500.8(a)(1).

■ The Court finds that the EIS does not adequately disclose and discuss the effect of raising the water level on archeological sites upstream from the proposed dam. While this failure may not be entirely the fault of the SCS, the fault is one which must be remedied. Prior to submitting the EIS, the SCS made inquiries of state and federal agencies to determine whether or not there were archeological sites in the affected area. They received a negative response. Before an EIS was submitted, however, the Minnesota Historical Society informed the SCS that important archeological sites were discovered in the area to be flooded. At this point, it became necessary for the SCS to include this new and important information as a supplement to the EIS. This was not done. At trial, the witnesses for the SCS and the Minnesota Historical Society testified that arrangements had been made to defer raising the lake level while the archeological sites were being explored and artifacts removed. It was anticipated that these steps could be completed within ninety days from the date that an anticipated federal grant was received by the Minnesota Historical Society. This important information was not contained in the EIS.

The Court finds that the EIS is deficient in that alternatives to building the dam at the downstream site are not adequately set forth and discussed; specifically, the alternative of modifying the temporary dam so as to make it permanent was totally ignored. Moreover, the alternative of building the new dam at or near the site of the present dam was dismissed with a conclusory statement and little or no discussion.[5] This treatment of the alternatives is directly viola-

---

5. The EIS with regard to alternatives states:
*Alternatives*
Alternatives considered and their impacts are outlined as follows:
*Use the Old Dam Site for the Proposed Dam*
The evaluated cost of building the proposed dam at the old dam site is $832,000.
The impacts of this alternative are:
1. It would create an 1,171 acre lake.
2. The recreation facilities would not be expanded beyond the existing level.
3. The desired level of flood protection along the lakeshore would be provided.
*Utilize Temporary Dam*
The impacts of this alternative are:
1. The structure would not meet the standards for a safe dam for either state or federal criteria.
2. The recreation facilities would not be expanded beyond the existing level.
3. This would be resetting the lake level at the elevation of the old dam and not be consistent with the established lake level (approximately 18″ higher).
*Remove the Temporary Structure and the Old Dam with no Other Action*
This would have total cost of approximately $25,000.
The impacts of this alternative are:
1. The lake would be approximately 400 acres.

2. The existing lakeshore property values would be reduced.
3. The lake fishery value would be greatly reduced.
4. Approximately seven hundred acres of aquatic habitat would be foregone.
5. The existing recreation facilities for water-based activities would be unuseable.
*Build A Single Purpose Dam*
Build a single purpose dam at the proposed location with a 150 ft. spillway crest at the elevation of the old lake. The cost of this alternative would $500,000.
The impacts of this alternative are:
1. This would be resetting the lake level at the elevation of the old dam and not be consistent with the established lake level (approximately 18″ higher).
2. This would provide the desired level of flood protection to the existing lakeshore property.
3. This would establish a lake area of approximately 1,240 acres.
4. The needed recreation facilities would not be developed.
5. The lake fisheries habitat would be increased.
6. One kind of stream fishery would be replaced by a lake fishery.
7. Approximately 90 acres of agricultural land would be flooded.

tive of 40 C.F.R. § 1500.8(a)(4), which provides:

> Alternatives to the proposed action, including, where relevant, those not within the existing authority of the responsible agency. (Section 102(2)(D) of the Act requires the responsible agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.") A rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, is essential. Sufficient analysis of such alternatives and their environmental benefits, costs and risks should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects * * *

40 C.F.R. § 1500.8(a)(4). *See*, Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346 (8th Cir. 1971).

The reasons for choosing the downstream site became apparent at trial. The witnesses for the SCS testified that the temporary dam could not be modified with safety, that the new dam could be built at the downstream site at a savings of more than $100,000, that the downstream site would provide additional public access which would enhance the recreational potential of Knife Lake and abutting property, and that this enhancement would make the project economically feasible and eligible for federal grants and assistance. In short, the testimony showed that the federal government could and would participate only if the dam were constructed at the downstream site. The Court does not quarrel with the testimony nor with the basic decision of the federal government that it would only participate if the dam were located at the downstream location. The problem is that the reasons for reaching this decision were not fully and adequately set forth in EIS as the law and the regulations require.

The Court does not suggest that the SCS must discuss in the EIS the possibility of alternative locations for the dam on every foot of the river. In fact, the record reveals that there is no significant difference between building the new dam at the temporary dam site or the old dam site. What needs to be done is to thoroughly discuss, in a revised EIS, the alternatives of (1) building a new dam at or near the site of the temporary dam or the old dam, and (2) modifying the temporary dam.

The Court finds that the cost-benefit analysis in the EIS does not comply with the regulations. The guidelines require:

> * * * Draft statements should indicate at appropriate points in the text any underlying studies, reports, and other information obtained and considered by the agency in preparing the statement including any cost-benefit analysis prepared by the agency. * * * In the case of documents not likely to be easily accessible (such as internal studies or reports), the agency should indicate how such information may be obtained. If such information is attached to the statement, care should be taken to insure that the statement remains an essentially self-contained instrument, cap-

---

*No Project Action*

The alternative of leaving the environment in its existing condition with no project must also be considered. A description of the environment of the measure area and its water and related land resource problems have been given in the Environmental Setting. It is estimated that approximately $14,800 in average annual net benefits would be foregone by not implementing this measure plan.

824

able of being understood by the reader without the need for undue cross reference.

40 C.F.R. § 1400.8(6).

The cost breakdowns submitted at trial should have been included in the EIS, included as an appendix or included by reference.

■ The Court finds no merit to plaintiffs' allegations that the commenting procedures utilized by the SCS in the preparation of the EIS violated the provisions of NEPA. The public was given an adequate opportunity to participate in the various hearings and was given adequate opportunity to comment on the draft environmental impact statement. Moreover, the response of the defendants to the comments submitted to it were sufficient except as they related to matters heretofore discussed.

The Court lastly finds that in all other respects, the EIS was prepared in accordance with the requirements of NEPA, and that the review of environmental factors undertaken by the SCS was adequate in all respects not specifically referred to herein.

The Court concludes that the EIS does not conform to requirements of law in the respects noted in this memorandum opinion, and that the plaintiffs are entitled to injunctive relief against Earl L. Butz and Kenneth E. Grant.

It is therefore ordered: That the defendants Earl L. Butz, individually and as Secretary of Agriculture, and Kenneth E. Grant, individually and as Administrator of the Soil Conservation Services, are enjoined from constructing or authorizing the construction of the dam and recreational areas involved in the Kanabec Lake improvement measure until such time as an environmental impact statement, which complies with NEPA and this decision, is properly filed.