**STEELE CREEK COMMUNITY ASSOCIATION, Plaintiff,**

v.

**The UNITED STATES DEPARTMENT OF TRANSPORTATION, and Coleman, William T., Jr., Secretary thereof, and Dow, James E., Acting Administrator of the Federal Aviation Administration, and the City of Charlotte, North Carolina, a municipal corporation, and Belk, John, Mayor thereof, and the Charlotte-Mecklenburg Board of Education, and North Carolina Department of Transportation and G. Perry Greene, Secretary, Defendants.**

No. C–C–75–186.

United States District Court,
W. D. North Carolina,
Charlotte Division.

July 25, 1977.

As Corrected Sept. 8, 1977.

Hugh G. Casey, Jr. and George S. Daly, Jr., Casey, Daly & Bennett, P. A., Charlotte, N. C., for plaintiff.

Keith S. Snyder, U. S. Atty., Asheville, N. C., William W. Sturges and John J. Doyle, Jr., Weinstein, Sturges, Odom, Bigger & Jonas, P. A., Henry W. Underhill, Jr., City Atty., William E. Underwood, Jr., Caudle, Underwood & Kinsey, Charlotte, N. C., and James B. Richmond, Sp. Deputy Atty. Gen. of N. C., Raleigh, N. C., for defendants.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

This case was heard July 18, 19, 20 and 21, 1977, on the questions whether defendants have now complied with the Environmental Protection Act and other pertinent statutes and regulations, and whether the injunction against further runway construction entered in August, 1975, should now be dissolved. The court is of the opinion that although plaintiffs have made a strong showing that the extra runway is not needed at this time and that its environmental consequences have been understated and discounted, even in this final go-'round, the injunction should be dissolved.

The proposed improvements to the Charlotte Airport, including parallel runways, were conceived in principle and publicized many years ago. In 1968 the Greiner Report was filed, and arrangements were begun for financing. The National Environmental Policy Act, adopted in 1969, placed upon government agencies a duty to evaluate the effects of major federal action upon the environment. The Airport and Airway Development Act of 1970, adopted in aid of airport development, stipulated that airport projects should be fully evaluated in terms of their effect upon numerous elements affecting the environment, and required that the Secretary of Transportation

". . . shall authorize no such project found to have adverse effect unless the Secretary shall render a finding, in writing, following a full and complete review, which shall be a matter of public record that no feasible and prudent alternative exists and that all possible steps have been taken to minimize such adverse effect." 49 U.S.C. § 1716(c)(4).

Although the National Environmental Policy Act of 1969 and the Airport and Airway Development Act of 1970 were passed after this project was planned, they do nevertheless apply. However, it is but human to remember their retroactive nature in judging the performance of the agencies involved.

■ The North Carolina statutes implementing the Clean Air Act of 1970 (see N.C.G.S. §§ 143–215.105 et seq.) do not apply because by authorized regulation those statutes do not affect projects under construction before November 15, 1973. Title 15, North Carolina Administrative Code, §§ 0.0800 et seq.

The original environmental statement of 1971 was grossly inadequate in its evaluation of noise and other necessary elements.

It dealt hardly at all with the inevitable *de facto* condemnation of at least one school and possibly some others. It did not reveal in any fashion understandable to laymen what effect the new runway would have upon homes and schools and churches, and it left serious doubt whether the necessary exploration of alternatives had been made. The defendants were restrained in August of 1975 from paving the runway until an adequate environmental study had been made.

Two years passed. A new environmental study several times as thick as the old one has been filed. The hearing was conducted this month instead of several months ago because the lawyers advised the court that earlier dates were inconvenient and that even if the injunction were lifted in the spring, paving could not be completed before winter.

The attorneys for all parties came to court beautifully prepared and presented a complicated factual situation with a clarity and brevity which was outstanding.

From the testimony, exhibits and arguments, and from all the competent material in the record, the court has reached a number of factual conclusions. Some of these conclusions are:

1. The new 10,000-foot runway is not presently needed and will not be needed for a good many years in the future, upon any considerations of capacity or safety.

2. Big long-range planes, such as the L–1011 (although not four-engine jets), now use the existing runway.

3. The existing runway is comparable in length to runways at Washington National Airport and at some other far busier establishments.

4. Capacity to handle the amount of traffic estimated for 1985 can be added in a less expensive fashion and in a way which will produce less damage to the environment.

5. The day to day operation of the Charlotte Airport is carried out with average delays of less than one minute per flight. This contrasts with delays of 5.1 minutes at LaGuardia, 2.3 minutes at Washington National, and 2 minutes at Atlanta, none of which places appears to have any current intention of adding or lengthening major runways, according to the evidence.

6. The delays of flights which figured so largely in the evidence are really delays which, in the main, affect people for whom Charlotte is just a way-station. Many of the delays in fact are caused by scheduling of flights so that many planes land and take off in short crowded periods of time so as to facilitate making connections in Charlotte by people en route through but not to or from Charlotte.

7. Some churches, such as Steele Creek Presbyterian Church, a 200-year-old landmark, as well as the surrounding community, will suffer damage from the additional noise of the new runway.

8. The new runway will spread the noise around and will add noise to new communities and reduce somewhat the noise now being experienced by people within the flight paths of existing runways.

9. The new runway will have serious adverse effects upon the use of school playgrounds both during and outside school hours.

10. Full consideration to the use of other available airports, such as Gastonia, Rock Hill and the proposed new Cabarrus County airport, does not appear to have been given.

11. The full extent in millions of dollars and other measuring devices of the damage to the neighborhoods affected has not been measured, and apparently can not be measured, but constitutes a real additional cost of the project. For example, Berryhill School, a quarter of a mile or so from the North End of the new runway, is being abandoned and relocated because of the noise of low flying planes.

On the positive side, a number of things can be said:

1. A 10,000-foot runway will handle all commercial planes now flying.

2. A 10,000-foot runway is probably safer; one witness remarked that pilots "never have enough concrete" to satisfy them.

3. Parallel runways permit more flexible management of take-offs and landings to reduce and disperse noise.

4. A noise abatement program (controlled routing of planes before landing and after take-off) is in fact now being instituted.

5. Increased air pollution, if it occurs, will not be the result of the new runway. In fact, if the new runway prevents delays from building up, there might be less air pollution. There has been no demonstration of a violation of a standard under the Clean Air Act that supports a claim under 42 U.S.C. § 1857h–2(a)(1)(A).

6. It can hardly be doubted that in the long run if traffic does approximate the 320,000 + flights per year which are estimated for 1985, the entire operation will be more orderly, with two parallel runways and the existing northeast-southwest runway, than can be accomplished with the existing runways.

7. Although existing reliever airports have not been considered significant by the defendants in their environmental impact statement, it is plain common sense and aviation experience, as shown by the record, that the more jets you get, the more the light planes will tend to find friendlier homes at other nearby airports.

8. In spite of the fact that use of school property for public park purposes will be adversely affected by operation of the new runway, the court under the standard of review set out below does not find that the defendants have failed to give the park situation the kind of study and analysis required by the statute and therefore concludes that there is no violation of Section 4(f) of the Department of Transportation Act. 49 U.S.C. § 1653(f).

\* \* \* \* \* \*

Fortunately, the court's job is not to decide whether or not to build the runway. If the responsible government authorities are resolved to build a regional airport in Charlotte, this court is not an agency authorized to second-guess that decision. Neither federal nor state defendants are obligated to make a perfect choice, least of all a choice which satisfies plaintiffs or a judge. The only function of the court is to determine whether under the appropriate standards of review defendants have complied with the pertinent statutes.

■ In *Conservation Council of North Carolina et al. v. Froehlke et al.*, 473 F.2d 664, 665 (4th Cir. 1973), the Court said:

". . . District Courts have an obligation to review substantive agency decisions on the merits to determine if they are in accord with NEPA.

" 'The review is a limited one for the purpose of determining whether the agency reached its decision after a full, good faith consideration of environmental factors made under the standards set forth in §§ 101 and 102 of NEPA; and whether the actual balance of costs and benefits struck by the agency according to these standards was arbitrary or clearly gave insufficient weight to environmental factors.'

*"Environmental Defense Fund v. Froehlke*, 473 F.2d 346 (8th Cir. 1972).

"We think the District Court must engage in a 'substantial inquiry' to determine 'whether there has been a clear error of judgment.' *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). . . ."

In *Fayetteville Area Chamber of Commerce v. Volpe et al.*, 515 F.2d 1021, 1024 (4th Cir. 1975), the Court cited with approval the standard that the district court should undertake

". . . to determine if the Secretary of Transportation inadequately explained his decision, all with the view to determining whether the decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'."

Continuing, on page 1026, the Court said:

". . . [The] test of compliance with § 102 of NEPA, 42 U.S.C. § 4332, 'is one of good faith objectivity rather than subjective impartiality.' "

The question is thus whether the decision to proceed with the runway is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."

■ Under that standard of review, the court is of the opinion that the environmental impact statement and the decision of the Secretary, with all due respect to the objections so clearly made by the plaintiffs, do pass muster; that the function of the court in this situation has been satisfied; and that the injunction should be dissolved.

It should also be noted that the suit has fully accomplished the purposes of the Environmental Protection Act by calling attention to the shortcomings in the original study; by identifying and presenting to the community the harm which the project will cause and thereby showing that the true cost must be measured in terms of destruction or alterations in the character of communities, over and above the mere cost of grading, equipment, paving and navigational aids. Specifically, it appears quite unlikely that the current noise abatement procedures would be under way but for this suit.

This opinion is brief and summary because time is short, and if the injunction is to be dissolved no further delay is indicated.

If any party desires a fuller set of findings of fact and conclusions of law, that party is free to tender such proposed findings and conclusions.