MR. JUSTICE MORRISON
dissenting:
I respectfully dissent. The draft environmental impact statements are grossly inadequate for failure to analyze need and explore alternative sources for satisfaction of need.
Montana’s Environmental Policy Act (MEPA), section 75-1-201, MCA, 1981, requires preparation of an environmental impact statement concerning the following matters:
(1) the environmental impact of the proposed actions;
(2) any adverse environmental effects which cannot be avoided should the proposal be implemented;
(3) alternatives to the proposed action;
(4) the relationship between local short-term uses of man’s environment and the maintenance and enhancement of long-term productivity;
(5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
The Montana Major Facility Siting Act recognizes that certain utility “facilities,” as defined by the Act, have an effect upon the environment to the extent that construction is prohibited “without a certificate of environmental compatability and public need” acquired pursuant to the provisions of the Act. Section 75-20-102, MCA, 1981. Section 75- *51 20-301(2), MCA, of the Act provides that a certificate of environmental compatibility and public need may not be approved by the Board of Natural Resources, except upon a finding and determination by the Board of, among other things:
(1) the basis of need for the facility;
(2) the nature of the probable environmental impact;
(3) that the facility represents the minimum adverse environmental impact, considering the state of available technology and the nature and economics of the various alternatives;
(4) each of the criteria listed in 75-20-503.
Section 75-20-503, MCA, enumerates more than 60 environmental factors to be studied in determining whether a proposed facility should be approved. That section requires, in part, that the following be considered: energy needs including growth in demand and projections of need; availability and desirability of alternative sources of energy in lieu of the proposed facility; conservation activities which could reduce the need for more energy.
The Facility Siting Act imposed upon the Department of Natural Resources the responsibility for undertaking technical studies and evaluations of the statutorily mandated environmental factors. Section 75-20-503 and 75-20-216(4), MCA, 1981. The Department of Natural Resources has the responsibility to formalize its technical studies in an environmental impact statement which it must file with the Board, to be used by the Board in making findings and determinations required under section 75-20-301, MCA.
The “report” required of the Department of Natural Resources under the Facility Siting Act, section 75-20-216(4), MCA, serves as the basic technical and evidentiary document upon which the Board must rely in making its findings and determinations under section 75-20-301, MCA, as to whether a certificate should be granted or denied. Any substantial deficiencies in the required documents should invalidate the Board’s findings and decision.
*52 Both the Siting Act and MEPA require the Department’s draft and final environmental impact statement to consider the need for alternatives to the proposed facility. In this case, the environmental impact statements make no attempt to consider either the need for or alternatives to a 161 KV facility to service Montana Power Company’s projected electrical demands in the Upper Madison/Lower Ruby Valleys.
The DEIS did not adequately study the need for, and alternatives to, a 161 KV> facility at Big Sky, Montana. The existing 69 KV line servicing Big Sky has a capacity of 9 megawatts which could, with modification, be increased to a maximum capacity of 12-15 megawatts. In its application for certificate to construct the 161 KV transmission line to Big Sky, Montana Power Company submitted that such a facility was needed to serve projected electrical loads at Big Sky of 30 megawatts. A 161 KV line has a carrying capacity of 200 megawatts. The Department’s draft environmental impact statements accept Montana Power Company’s load growth projections without question. Neither document makes any attempt to evaluate the basis of the projected load. There is no analysis of the types of energy demands at Big Sky which are expected to increase and, therefore, which could justify additional electrical transmission service. Such an analysis is critical. Energy demands for heat are not constant. They occur only during the winter and are heaviest only at certain times of the day. Furthermore, energy demands for heat do not require electrical service in that they can be met through other lower grade energy sources, including better conservation practices. These matters were not studied.
The evidence produced at the hearing before the Board of Natural Resources disclosed that all but 5 megawatts of required electrical power could be met through conservation alternatives not requiring additional electrical service. Five megawatts is well within the capacity of on-site diesel generation or a smaller transmission line. A 161 KV line, with a *53 carrying capacity of 200 megawatts, 195 megawatts in excess of that actually needed at Big Sky, seems clearly to not be needed. The failure of the draft environmental impact statements to address the actual need and existing alternatives renders them totally deficient.
The District Court recognized the gross inadequacies in the draft environmental statements but held such deficiencies to not constitute a basis for reversal of the Board’s decision. The District Court said “that the entire siting act process and the Board’s decision based upon the entire record is the functional equivalent of an environmental impact statement.” No authority is cited for this proposition.
The Facility Siting Act requires that “the Department shall make a report to the Board which shall contain the Department’s studies, evaluations, recommendation and other pertinent documents resulting from its study and evaluation. . .” Section 75-20-216(4), MCA, 1981. The function of the statement is to perform technical analysis and provide expert documentation to the Board because the Board lacks technical expertise to perform this function itself.
The Federal Courts have refused to adopt the rationale here adopted by the trial court. In Environmental Defense Fund, Inc. v. Froehlke (8th Cir. 1972), 473 F.2d 346, the Corps, of Engineers argued that although discussion of alternatives in its EIS was deficient, the EIS should be considered sufficient when viewed against the entire record. In rejecting this argument, the 8th Circuit Court of Appeals said:
“The Corps, argues that despite these omissions, its impact statement should be considered sufficient because ‘at every step of the way, from preauthorization studies through detailed project planning, which includes recent environmental and mitigation studies, the voices of fish and wildlife interests have been heard, considered and reported to Congress.’ We disagree. Nothing less than a complete impact statement can serve the important purposes of section *54 102(c)(iii) of MEPA. As the District of Columbia Circuit Court stated in Natural Resources Defense Counsel, Inc. v. Morton, 458 F.2d 827, 834 (D.C.Cir.1972), ‘it is the essence and thrust of EPA that the pertinent Statement serve together in one place a discussion of the relative environmental impact of alternatives.’

U

“A statement which includes a detailed discussion of all reasonable alternatives to a proposed project and their effects [case citation omitted] insures that agency officials will be acquainted with the tradeoffs which will have to be made if any particular line of action is chosen.”
The rationale adopted by the District Court to render the DEIS deficiencies harmless error, has the effect of nullifying the statutory requirement for environmental impact study.
Unlike the District Court, the majority here attempts to defend the DEIS as adequate. Not even the Department which prepared the statements can defend them. The majority admits:
“The Department, in its briefs to the District Court and to this Court, acknowledges that the EIS’s contain no adequate consideration of alternatives to a 161 KV line serving the Upper Madison/Lower Ruby Valleys. The Department justifies this omission by stating that MPC failed to comply with the Siting Act and the rules adopted pursuant thereto in identifying in MPC’s application the need for a facility to serve the demand in the Upper Madison/Lower Ruby Valleys.”
The majority then proceeds to gloss over the deficiencies in a style that approaches advocacy. Apparently, the law now will forgive and approve the Department’s deficiencies that result from omissions in the Utility’s application. The decision here has established a precedent which substantially weakens the Facility Siting Act and tends to judicially erode the environmental protection assurances afforded by the Montana Legislature.
*55 I view the course of action now being taken by this Court to be premised upon expediency. It is true that the process is cumbersome but had the Montana Power Company made a complete application, and had the Department of Natural Resources thereafter rendered draft environmental impact statements in conformity with law, these problems would not have arisen. By this decision we reward the wrongdoers.
I register a strenuous dissent.