**STATE OF OHIO ex rel. William J. BROWN, Attorney General of Ohio, Plaintiff,**

v.

**Howard H. CALLAWAY, Secretary of the Army, et al.**

**Civ. Nos. 8892 and 8893.**

United States District Court,
S. D. Ohio, W. D.

Aug. 24, 1973.

George W. Pring, William S. Fein, Asst. Attys. Gen., Columbus, Ohio, for plaintiff.

James E. Rattan, Asst. U. S. Atty., Columbus, Ohio, for defendants.

## OPINION AND ORDER

CARL B. RUBIN, District Judge.

This matter is before the Court upon plaintiff's motion for a preliminary injunction. Comprehensive memoranda, briefs, affidavits, and exhibits have been filed; oral arguments have been heard and testimony received. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## I

### FINDINGS OF FACT

1. As part of the Flood Control Act of June 28, 1938, 52 Stat. 1215 (33 U.S.C. § 701 et seq.), seventy-four reservoirs were authorized for the Ohio Valley. These reservoirs were constructed at various times and on various rivers. Included among such reservoirs are those to be located on Caesar's Creek and the East Fork, each a tributary of the Little Miami River, itself a tributary of the Ohio River. Funding for the above projects commenced in 1962 with a Congressional appropriation of approximately twelve thousand dollars ($12,000.00) for each. These appropriations have increased year by year in approximately the same amount. Significant amounts of appropriation began in 1969 with $1,550,000.00 appropriated for Caesar's Creek and $1,600,000.00 appropriated for East Fork. During fiscal 1973, $5,800,000.00 was appropriated for Caesar's Creek and $4,200,000.00 for East Fork. For fiscal 1974, $8,000,000.00 has been budgeted for Caesar's Creek and $2,600,000.00 for East Fork.[1]

2. Each project is intended to help control floods, provide a more desirable water supply, improve water quality, and create new recreational features. Land acquisition began in 1967 and each will require approximately 11,000 acres of land. As of June 30, 1973, 88.7% of the necessary land had been acquired for East Fork and 77.7% for Caesar's Creek.[2]

[1]. These appropriations do not relieve any Federal agencies from their obligations under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970), under a theory of implied Congressional exemption or a final Congressional approval of any Environmental Impact Statement then in existence. See Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164 (6th Cir. 1972); Environmental Defense Fund v. Froehlke, 473 F.2d 346, 353–355 (8th Cir. 1972); Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783, 785 (1971); Rule XXI of the House of Representatives; S.Rep.No.91–118, 91st Cong., 2d Sess. (1970).

[2]. Defendant's Memorandum at 5.

3. Three contracts are presently in force for construction at these two projects.[3] For Caesar's Creek, a contract for the construction of outlet works, dam, and spillway, No. DACW 27–72–C–0086 in the face amount of $7,853,737.55 was awarded to Butt & Head, Inc., 3858 New Germany Road, Dayton, Ohio, on March 1, 1972.

For the same project, contract No. DACW 27–73–C–0022 was entered into on August 31, 1972 for the construction of an office and shop building. This contract was awarded to the Small Business Administration, Midwest Regional Office, and was subcontracted in full to Francis & Washington, Inc., 125 South Infirmary Road, Dayton, Ohio. This contract is in the face amount of $216,551.45.

For the East Fork Lake project, contract No. DACW 27–73–C–0068 was entered into on December 29, 1972, with S. J. Groves & Sons Company, Minneapolis, Minnesota, for the construction of a dam and spillway in the face amount of $12,257,839.30.

4. On January 1, 1970, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. (1970), became effective. In accordance with § 102 of NEPA, 42 U.S.C. § 4332 (1970), an Environmental Impact Statement (EIS) was filed for the East Fork project on February 25, 1971, and an Environmental Impact Statement for Caesar's Creek was filed on April 16, 1971. There is also an undated document entitled "Draft Environmental Statement" for each project consisting of three pages. In addition, on August 11, 1972, a supplement to the East Fork EIS was filed. These five documents comprise the sole evidence of compliance with § 102 of NEPA.

Each project is intended to convert a free-flowing stream into an impounding lake behind a dam and spillway. Each will involve the removal of trees and groundcover, and the excavation of topsoil and subsoil from approximately 11,000 acres of land.

Recreational opportunities inherent in a free-flowing stream will be lost and those incident to a stillwater lake will be gained. Biosystems that flourish in the former environment will be replaced by those that flourish in a stillwater lake.

Each of the projects will contribute water to the Little Miami River, particularly during periods of low water in summer. No evidence of excessive adverse environmental effects appears in either Environmental Impact Statement. No evidence has been presented to the Court as to environmental advantages of flow regulation of the Little Miami River.

5. The situation in August of 1973 as to each of these projects is as follows:

(a) Environmental Impact Statements have been filed which are admittedly below 1973 standards for such statements.

(b) Environmental damage incident to the contracts, i. e., site clearing, excavation to bedrock, construction of service roadways, has already occurred. No further significant environmental damage from such contracts appears likely. Future contracts will have substantial environmental impact.

(c) Only the months of August, September and October remain during which outdoor construction may feasibly

---

3. According to Defendant's Memorandum at 6, there are three contracts which have already been let for both the East Fork and Caesar's Creek Lake project. The defendant has submitted as evidence copies of such contracts. Defendants have also submitted an Affidavit "A" of Col. Charles J. Fiala, Colonel of the Corps of Engineers, assigned as District Engineer of the Louisville District, in which Col. Fiala on Exhibit "9" indicates that other contracts have been let. In oral argument on August 14, 1973, the Government and the United States Corps of Engineers assured this Court that the three contracts to which they referred on page 6 of their Memorandum and copies of which they have submitted to this Court as evidence were the only contracts in existence. This Court accepts as true the representations of the defendant made in their Memorandum and at oral argument.

continue in the present construction season.

## II

## OPINION

There are four customary conditions precedent to the granting of a preliminary injunction. The plaintiff must establish that a substantial question is at issue; that there is probability of success on the merits; that a balancing of injuries to the parties requires preliminary relief; and that the public interest would be served by such preliminary relief. Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806 (E.D.Tenn.1972), aff'd, 468 F.2d 1164 (6th Cir. 1972); Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970), aff'd sub nom., Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), Garlock, Inc. v. United Seal, Inc., 404 F.2d 256 (6th Cir. 1968).

There is no doubt that this is a matter of substantial importance to all the parties involved. Since defendants have conceded that complete Environmental Impact Statements have not been filed, there is probability of success for plaintiff upon that limited issue.

Implicit in any construction project of this magnitude may be substantial and irreparable injury to the public at large. Without seeking to catalogue the damages that might result, the Court observes merely that flooding thousands of acres of land and conversion of free-flowing streams into impounding reservoirs are, for all practical purposes, irreversible. However, while plaintiff may be successful in the limited effort to halt these projects pending the filing of a more comprehensive Environmental Impact Statement, it is not equally clear that plaintiff will enjoy ultimate success in terms of possible alteration or abandonment of these two projects. For the purposes of a preliminary injunction, however, the plaintiff has demonstrated a sufficient probability of success on the merits.

In considering the relative equities present in the case at bar, the Court observes that three contractors, all innocent parties to this controversy, in good faith bid upon these contracts and subsequently committed substantial funds, material, equipment, and time to the proper completion of these contracts. Since it appears that their continuing activity will not significantly damage or otherwise affect the environment, equitable considerations suggest that this Court avoid penalizing these contractors. Under similar circumstances, Courts have permitted a portion of project contracts to be completed. Environmental Defense Fund v. Tennessee Valley Authority, *supra*, (road surfacing, map making, and reporting activities were allowed to proceed); Conservation Council of North Carolina v. Froehlke, 473 F.2d 664 (4th Cir. 1973) (dam construction and building on cleared land allowed); Environmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972) (remand to the District Court for decision if contracts could go ahead in face of general injunction); Environmental Defense Fund v. Armstrong, 356 F. Supp. 131 (N.D.Cal.1973) (planning, ordering and assembling of materials allowed to continue).

## III

## CONCLUSIONS OF LAW

### A.

This Court has jurisdiction in accordance with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970).

### B.

There is enjoined upon all Federal agencies, including the United States Corps of Engineers, the obligation of complying with § 102 of the National Environmental Policy Act of 1969 by the preparation and submission of an adequate Environmental Impact Statement. Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Com-

mission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

## C.

■ The statements filed as to both Caesar's Creek Lake project and the East Fork Lake project do not fully comply with the National Environmental Policy Act and therefore, the Court must fashion appropriate relief.

## IV

## ORDER

A preliminary injunction is hereby issued enjoining defendants from executing additional contracts on either of said projects; from clearcutting trees, from removal of brush and groundcover, from stripping away and destruction of topsoil, from relocating or closing roads, and from any other construction activity which would alter the natural environment of the project area. Completion, however, of those items specifically listed in the construction contracts referred to in the Findings of Fact may proceed at this time.

There are presently in the United States District Court for the Southern District of Ohio, Western Division, land appropriation cases wherein the United States of America is seeking to appropriate property for both of these projects. While the Court has not been so specifically advised, there may be transactions in progress in the various stages of negotiation wherein the United States is seeking to acquire property for these projects. Where such negotiations may be ultimately unsuccessful, the United States Attorney for the Southern District of Ohio may be contemplating land appropriations cases. Nothing herein stated shall be construed as a limitation upon the above pending litigation, or efforts to acquire real estate for these projects at whatever stage such proceedings may be.

Except as noted above, further contracts for the advancement of these projects may not be entered into by the United States of America without prior approval of this Court.

This matter is hereby continued pending the filing by defendants of a complete and adequate Environmental Impact Statement in accordance with § 102 of NEPA.

It is so ordered.

## SUPPLEMENTARY ORDER

This matter returned to the Court when plaintiff by motion sought amendment of the previous Opinion and Order of this Court, dated August 24, 1973. Pursuant thereto, the Court made a personal inspection of each of the project sites and reexamined in light thereof its Order. Although plaintiff withdrew his motion, there appears reason for the Court to supplement its previous Order so all parties understand what is and is not permitted during the present construction season.

By way of preface, it should be pointed out that all orders assume a hearing on the merits prior to the commencement of the next building season. Both the original Order and this Supplementary Order are designed only to utilize the remaining eight weeks of the present construction season on projects well underway.

In this connection the Court must observe that substantial environmental change has already occurred. Hillsides have previously been stripped of foliage; groundcover and topsoil excavated in substantial quantities; and work roads have been built. All of this occurred during the 1972 and 1973 building seasons during which plaintiff, for reasons yet unexplained, elected not to exercise his asserted trust obligation to the citizens of Ohio.

Finding of Fact 4 in the original Order contains an error and is amended hereby. While each of the projects consist of approximately 11,000 acres, the vast majority of each area will remain intact as wooded groves, forests, and meadows for camping and other recrea-

tion purposes. 2,800 acres at Caesar's Creek and 2,100 acres at East Fork will ultimately be clearcut and inundated. Up to an additional 2,000 acres at each site may be inundated at varying times and in varying depths, but no removal of groundcover, trees or topsoil is intended for such areas.

The two projects are approximately similar: each contains a dam site, a spillway, a conduit, an intake tower, one or more saddle dams, one or more "borrow" areas, and work roads. For clarity, each aspect will be dealt with separately.

### Caesar's Creek

1. *Dam Site*—Both sides of the stream and embankment have been cleared of vegetation and the topsoil stripped almost to bedrock. The creek has been diverted into a conduit tunnel by coffer dams, and the former stream bed is ready for work to commence. The work plan for the next eight weeks forecasts construction of a low coffer dam across the stream which will be later incorporated into the main dam structure. Such work may continue.

2. *Spillway*—The spillway has been cleared and no additional work is contemplated during the present construction season.

3. *Conduit*—The conduit tunnel has been completed.

4. *Intake Tower*—The operating tower is under construction and work may continue.

5. *Saddle Dams*—All saddle dams have been completed.

6. *Borrow Areas*—The borrow areas for construction of the saddle dams have been graded and seeded. Borrow Area # 1, located east of the spillway, is presently in use. Borrow Area # 2 is immediately north of the western end of the spillway. It has been cleared of groundcover and topsoil and both borrow areas may be used. No additional borrow sites not presently cleared may be used.

7. *Work Roads*—Existing roads necessary for the contractors to continue operations in this building season may be used. Additional roads for permitted construction may be built.

### East Fork

1. *Dam Site*—The easterly side of the dam site has been cleared and excavated in most areas to bedrock. Completion of this excavation may be carried forth. The westerly side is intact with neither topsoil nor foliage removed. No further activities may be conducted on the uncleared westerly side of the dam site without specific authorization of this Court.

2. *Spillway*—The spillway area has in the main been cleared. Any necessary excavation may continue.

3. *Conduit*—The conduit has been completed although the stream has not yet been diverted through it.

4. *Intake Tower*—The intake tower has been completed.

5. *Saddle Dams*—Only one saddle dam is contemplated for this project. Construction by way of clearing and earthmoving has begun and such work may continue.

6. *Borrow Areas*—Borrow areas are located on the northerly end of the spillway. The ground has been cleared and some dirt removed therefrom. Continued use of the borrow areas may continue.

7. *Work Roads*—Existing roads necessary for completion of the saddle dam have been built. Additional roads necessary for permitted construction may be built.

Significant to the question of immediate environmental damage is the present appearance of the project sites. Like any other construction area, the view is aesthetically unattractive; Mud, dirt, clay and rock abound. Trees and grass no longer grace large tracts of land. But where work has been completed, groundcover now grows on saddle dams, and borrow pits are graded and green.

Suspension of work at this time would only prolong the environmental harm and could, in some instances, increase it. Where ground has been stripped of its natural cover and protection, suspension of work at this time can only intensify the damage from runoffs and erosion.

It is with such considerations in mind that the order of August 24, 1973 is hereby supplemented.