**CITY OF ROMULUS, a Municipal Corporation, et al., Plaintiffs,**

v.

**COUNTY OF WAYNE et al., Defendants.**

Civ. A. No. 74-72118.

United States District Court, E. D. Michigan, S. D.

March 31, 1975.

580

Jerrold A. Fadem, Fadem, Berger & Stocker, P. C., Beverly Hills, Cal., William S. Munger, City Atty., City of Romulus, Munger & Crum, P. C., Southfield, Mich., for plaintiffs.

E. Barrett Prettyman, Jr., James A. Hourihan, George U. Carneal, Allen R. Snyder, Hogan & Hartson, Washington, D. C., Aloysius J. Suchy, Corp. Counsel, County of Wayne, George H. Cross and David R. Kaplan, Asst. Corp. Counsels, Detroit, Mich., John P. Cushman, Gen. Counsel, Clayton M. Foor, Asst. Gen. Counsel, Wayne County Road Com'n, Detroit, Mich., Edward Fagen, Gen. Counsel's Office, F. A. A., Washington, D. C., Ralph B. Guy, Jr., U. S. Atty., Fred M. Mester, Asst. U. S. Atty., Detroit, Mich., for defendants.

## OPINION AND ORDER

## GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

KENNEDY, District Judge.

Plaintiffs have brought this action seeking to halt the construction of a third parallel runway at Detroit Metropolitan Wayne County Airport.

The construction of the proposed runway, designated 3R–21L (30 degrees right, 210 degrees left of due north) is being partially funded by the federal government under the matching grant provision of the Airport and Airway Development Act. 49 U.S.C. § 1701 et seq. Plaintiffs seek to enjoin the construction of the proposed runway, or at least the use of federal funds in the project, until the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 et seq., are met. Plaintiffs contend that the "detailed statement" of the environmental impact (EIS) of the proposed project which was prepared by the Federal Aviation Administration (F.A.A.) in accordance with Section 102(2)(C) of NEPA is inadequate and complies with neither the letter nor the spirit of the Act.

A seven-day hearing was held on plaintiffs' motion for a preliminary injunction.

### *Judicial Review of the EIS*

Considerable litigation has followed the signing into law of the National Environmental Policy Act on January 1, 1970. Since that date reviewing courts have moved from the question of the retroactive application of NEPA to the more basic questions of whether the duties created by NEPA are judicially enforceable and the parameters of judicial review of agency decisions.

In this last area courts have split on the directives of NEPA as a mandate for judicial scrutiny of agency action. Some courts have declared that only the procedural requirements of Section 102 may be judicially reviewed; others have found a mandate for review of the ultimate substantive agency decision under the sweeping language of Section 101 of the Act. *Compare* National Helium Corp. v. Morton, 455 F.2d 650 (10th Cir. 1971) *with* Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). *See* Note, The Least Adverse Alternative Approach to Substantive Review under NEPA, 88 Harv.L.Rev. 735 (1975).

Plaintiffs have not attempted to prove that the substantive decision to construct a third parallel runway was in error; their argument is that the EIS failed procedurally to disclose the necessary information so that a reasoned decision could be rendered.[1]

1. The Court at this time expresses no opinion as to whether the facts and evidence set forth in the EIS comply with the substantive requirements of Section 101 of NEPA.

Agency action under NEPA is subject to judicial review pursuant to § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See* Environmental Defense Fund v. Corps of Engineers, *supra,* 470 F.2d at 298–99, n. 14; Town of Groton v. Laird, 353 F. Supp. 344, 348 (D.Conn.1972). A reviewing court may set aside agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). *See* Scenic Hudson Preservation Conference v. F.P.C., 453 F.2d 463 (2nd Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972).

Where judicial review is sought under NEPA, agency action is to be measured by the strict requirement that the procedural duties of Section 102 must be fulfilled by the "fullest extent possible." Judge Wright in Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109 (1971) after reviewing the legislative history of Section 102, concluded: ". . . *if the* decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse." *Id.* at 1115.

The pertinent instructions of Congress appear in § 102(2) of NEPA, 42 U.S.C. § 4332:

> all agencies of the Federal Government shall—
>
> * * * * * *
>
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of the long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Plaintiffs do not dispute the fact that a detailed environmental impact statement was prepared by the sponsoring agency. They maintain that the statement, while detailed, is misleading, unsupportive of certain conclusions reached, incomplete, and scientifically inaccurate.

The thrust of plaintiffs' argument is that while the F.A.A. was aware of the shortcomings of the EIS in both methodology and data presented, non-agency readers are not aware that the EIS is less than a full and fair disclosure of the environmental impact of the proposed project.

A cursory reading of the Act makes it apparent that the primary purpose of the EIS is to compel federal agencies to give serious weight to environmental factors in making discretionary choices on federal projects significantly affecting the quality of the human environment. Senator Jackson, NEPA's principal sponsor, summarized this purpose:

> [n]o agency will [now] be able to maintain that it has no mandate or no requirement to consider the environmental consequences of its actions. [Hearings on S. 1075, S. 237 and S. 1752 Before Senate Committee on Interior and Insular Affairs, 91st Cong., 1st Sess. 206 (1969)].

If the sole purpose of the EIS is that it serve as an *intra-agency* catalogue of

environmental considerations, there would be little doubt that the present statement is adequate in the area of "need for a new runway". The alleged deficiencies of omission were known to the staff preparers of the EIS, and presumably to the agency decision-makers,[2] and thus could be considered when weighing the conclusions reached in the EIS.

Such, however, is not the case. Section 102 indicates that Congress intended a broader purpose in requiring an EIS statement for Federal projects. Among the stated requirements of Section 102 is that:

> [p]rior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review process. [42 U.S.C. § 4332(2)(C)].

The requirements of NEPA, if followed, assure that the decision-maker is fully aware, not only of the objective environmental results of the proposed project, but also the opinions of allied federal agencies, the Council on Environmental Quality (C.E.Q.), and the public. Environmental Defense Fund v. Corps of Engineers, 342 F.Supp. 1211 (E.D.Ark.1972), aff'd, 470 F.2d 289 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). *See* Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972).

The District of Columbia Circuit in Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971), based the requirement of extra-agency disclosure on the need of the agency decision-makers to be fully apprised of appropriate outside opinion so that the ultimate project decision would be based on all available information.

> The ultimate decision must of course take into account matters other than environmental factors, but insofar as staff has prepared the environmental statement for transmission and consideration throughout the entire executive process, the official making the ultimate decision, whether within or outside the agency, must be informed of the full range of responsible opinion on the environmental effects in order to make an informed choice. Moreover, the statement has significance in focusing environmental factors for informed appraisal by the President, who has broad concern even when not directly involved in the decisional process, and in any event by Congress and the public. [463 F.2d at 787].

Plaintiffs allege that the final EIS is not a full and fair disclosure to the public and commenting agencies in three areas: the study on the need for a new runway, the alternatives discussed, and the study on the sound effects of the proposed runway.

*Need for a New Runway*

The EIS contains both a capacity study of Metropolitan Airport with and without the proposed runway and a projected demand study for the years 1972,

2. Whether agency decision-makers are aware of technical deficiencies known to staff preparers of an EIS is open to question. It is axiomatic, however, that for an agency review of staff recommendations to be truly independent, deficiencies which may undermine the conclusions reached in the draft EIS should be known to the ultimate decision-maker.

1976 and 1980. The statement concludes:

> The analysis of runway capacity also shows that the existing runway configuration is rapidly approaching saturation. The consequence of runway saturation is aircraft delay. Aircraft delay increases exponentially as the runway system is required to handle ever increasing numbers of aircraft. As delay accumulates, increased operating costs are incurred. The amount of aircraft delay associated with the PANCAPS computed for 1976 and 1980, expressed in terms of annual hours of delay and annual dollar costs, are shown in Tables B–4 and B–5.
>
> How much will the additional capacity created by the construction of new Runway 3R–21L reduce annual delay cost? Figure B–1 shows a plot of annual savings versus the number of aircraft movements at Metro Airport. An annual activity level of 350,000 aircraft movements produces an annual saving of $2.2 million in 1976 and $3.1 million in 1980. Annual delay, and therefore cost, increase exponentially as aircraft movement levels increase. The magnitude of this cost reduction alone argues strongly for the addition to the Detroit metropolitan area airport system.

This conclusion is reiterated in the section of the EIS dealing with alternatives. There, one of the effects listed under a "Do-Nothing" alternative is "[i]ncreased air traffic delays resulting in reduced, inconvenient and less dependable air service for the Detroit area."

Section 102 does not specifically mandate a discussion of either the necessity or benefits of the proposed action. That section, however, requires the EIS to include "alternatives to the proposed action." Courts have interpreted this directive broadly, stating that one of the alternatives that must be considered is abandoning the proposed action entirely if the investigation discloses unavoidable adverse environmental effects. *See e. g.*, Town of Groton v. Laird, 353 F.Supp. 344 (D.Conn.1972). The complete impact statement must, then, contain more than a catalogue of environmental facts. It must disclose the necessity of, or the reason for, the project and "explicate fully its course of inquiry, its analysis and its reasoning." Ely v. Velde, 451 F.2d 1130, 1139 (4th Cir. 1971). Thus, "the complete formal impact statement represents an accessible means for opening up the agency decision-making process and subjecting it to critical evaluation by those outside the agency, including the public." Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 351 (8th Cir. 1972).

The Court in *Calvert Cliffs'* adopted similar reasoning in stating:

> This requirement, [of discussing alternatives] like the 'detailed statement' requirement, seeks to insure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent optimally beneficial decision will ultimately be made. [Calvert Cliffs' Coordinating Committee v. A. E.C., *supra*, at 1114].

Plaintiffs offered testimony to prove that the demand-capacity portion of the EIS did not meet this requirement. They allege:

> (1) the demand figures for the years 1972, 1976, and 1980 are unrealistically high and misleading in view of the downturn in commercial air passengers since 1971;
>
> (2) the demand figures are based on erroneous assumptions, including unlimited supplies of jet aircraft fuel and an elastic demand curve irrespective of fare increases;
>
> (3) the demand figures are based solely on the number of aircraft opera-

tions and not the more responsive indicator of passenger demand;

(4) the conclusion that the existing runway configuration is rapidly approaching saturation is unsupported by the data included in the EIS;

(5) a proposed decrease in lateral spacing requirements for simultaneous instrument approaches, which if adopted would increase present capacity, is not mentioned;

(6) the conclusion in the EIS that the hourly capacity of the airport will be increased by 50% in 1976, is misleading;

(7) delay is never defined;

(8) the cost savings predicted for 1976 and 1980, based on a decrease in delay, is misleading;

(9) delay figures are based on an obsolete and inadequate projection of fleet mix; and

(10) the delay chart was predicted by computer and never verified by a tower study.

Several of these claims are not cognizable by this Court under the limited scope of review afforded agency action under the Administrative Procedures Act. The allegations that the demand figures are based on erroneous assumptions, that a better indicator of future demand is projected passenger use and the claim that computer predictions by themselves are inaccurate are not persuasive. This Court must decide whether the decision to proceed was arbitrary and capricious; not whether other and perhaps more accurate scientific studies should be made. Cape Henry Bird Club v. Laird, 359 F.Supp. 404 (W.D.Va.1973), aff'd 484 F.2d 453 (4th Cir. 1973); Lathan v. Volpe, 350 F. Supp. 262 (W.D.Wash.1972) vacated on other grounds, 455 F.2d 1111 (9th Cir. 1972). Indeed, "[f]urther studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies," Environmental Defense Fund, Inc. v. Corps of Engineers, 342 F.Supp. 1211, 1217 (E.D.Ark.1971), aff'd, 470 F.2d 289 (8th Cir. 1972), but this fact alone does not require reversal.

Such claims are hypercritical and do not meet the standard of adequacy set out by the Sixth Circuit.

Our examination of the final impact statement indicates that it is as thorough and complete on all pertinent features as could reasonably be expected. N.E.P.A., although rigorous in its requirements, does not require perfection, nor the impossible. In assessing the adequacy of such statement, practicability and reasonableness . . . are to be taken into account along with the broad purposes of the Act to preserve the values and amenities of the natural environment. [Environmental Defense Fund v. Tennessee Valley Authority, 492 F.2d 466, 468 n. 1 (6th Cir. 1974)].

Plaintiffs' claim that the EIS is deficient in not including the F.A.A. proposal for reducing lateral separation requirements for simultaneous instrument landings is likewise unpersuasive. An EIS need not include all future contingencies. The possibility that present limitations on landing requirements will be reduced in the future, thereby increasing runway capacity, is too uncertain to require inclusion. The Notice of Proposed Rulemaking regarding that proposal was not published until January 1974, several months after the draft EIS had been submitted. Further, defendants' experts testified that several years elapsed between the notice of proposed rulemaking and the adoption of the present landing requirements, and that present technology does not exist to permit adoption of the proposed reduction.

The EIS compiles the results of several forecasts of aircraft operations completed from 1968–1972. Because of the variance of these results an updated forecast was prepared in 1972, based on forecast data supplied by the Air Transportation Association (ATA). This forecast predicted 271,492 total operations for the year 1972, 298,000 for 1976,

and 324,000 for the year 1980. These figures were, in turn, used as the basis of the delay study in the EIS and the prediction of impending airport saturation.

 Plaintiffs, in an attempt to show these forecasts to be erroneous, presented evidence of the actual number of operations at Metropolitan through 1974, as well as F.A.A. forecasts published in 1971 and 1974. For a determination of the sufficiency of the demand study only those figures which were available before the submission of the final draft EIS in October, 1973, are relevant. To view the 1972 predictions with the benefit of the hindsight available three years later merely confirms the truism that predictions are fallible. The Court is of the opinion, however, that the failure to include figures *then* available as to actual operations and future forecasts prepared by the F.A.A.[3] was potentially misleading, both to the agency decision-makers, other reviewing agencies and the public. Both NEPA and the dictates of basic fairness to the reader required the inclusion of this data in the EIS. Current actual figures and agency sponsored forecasts will be required in any re-submitted EIS. The inclusion of current data is not mandated by the possibility that these figures will show that the project is unwarranted[4] but by the underlying purpose of NEPA—to make the EIS the basic source material for environmental decisions.

 Similarly, the Court finds the statement that hourly capacity will be increased by 50% in 1976, by the addition of the new runway misleading. Martin Warskow, an employee of the consulting firm which prepared the capacity section of the EIS, testified that this conclusion is based on data contained in the EIS that an increase of 17% in operations from 300,000 to 350,000 results in a delay increase of 87% (from 4,877 hours to 9,129 hours of annual delay).

Several factors make this explanation less than adequate. The reader is never told what data supports the conclusion of a 50% increase; there are no predictions of demand at 350,000 annual operations—the highest prediction is 324,000 operations;[5] and net savings is only 16.-62% (the delay increase with the existing runways (87.15%) v. the delay increase with the new runway (70.53%)).

 The Court likewise finds the conclusion that delay savings with the new runway will amount to $2.2 million in 1976, and $3.1 million in 1980, to be unsupported. This conclusion is open to the same criticism as the prediction for capacity increase—it is based on the assumption that Metropolitan Airport will handle 350,000 annual aircraft operations. In addition, the Court finds unexplained inconsistencies in the fleet mix (percentage of aircraft types using Metropolitan) used to predict cost savings. The demand forecast predicts a stable number of operations for general aviation aircraft in the future which would comprise 28%, 26% and 24% of the entire fleet in the years 1972, 1976 and 1980. Yet, in the fleet mix predictions the types of aircraft generally described as non-carrier, general aviation comprise 40%, 39% and 25% of the fleet for the same years. The relative decrease in general aviation and the resultant relative increase in carrier craft as a percentage increase of the fleet mix, pro-

3. Actual operations at Metropolitan Airport in 1972 and 1973, were 262,596 and 278,554. The *Terminal Area Forecast 1973–1983*, prepared by the F.A.A. in December, 1971, indicated fiscal year forecasts for the years 1973, 1974, 1975 and 1978 of 236,000; 252,000; 267,000; and 311,000.

4. The most recent F.A.A. forecast (September, 1974) is in line with the predictions of the EIS. It forecasts 300,000 total operations for 1976, and 330,000 for 1980.

5. Some of the prior forecasts estimated 1980 operations in excess of 350,000 but these forecasts were rejected in the EIS in favor of the 1972 ATA–Wayne County Road Commission Study.

duces a greater dollar delay savings than if the more stable figures of the underlying demand forecast were used.

More fundamentally, the term delay is never defined despite its pivotal importance to the conclusions reached. The EIS states acceptable levels of delay but does not indicate how delay is computed. Whether delay, for instance, includes taxi delay, as well as delay once an aircraft is in position for take-off, or delay in clearance for landing is a factor which would appreciably aid the reader in analyzing the conclusions reached in the EIS.

Finally, the conclusion that the existing runway configuration is rapidly approaching saturation is not accompanied by supporting data. Indeed, much of the data that can be assembled from the EIS supports the opposite conclusion.

The EIS in defining Practical Hourly Capacity states that an acceptable level of delay is four minutes per operation. Acceptable annual delay for 350,000 operations would multiply out to 23,333 hours—far in excess of the projected delay of 9,129 hours for 1976 with existing runways.[6] If delay is the prime factor in determining saturation, as is implied in the EIS summary, the EIS definition of acceptable delay refutes the conclusion of impending saturation. If other factors contribute to saturation of a runway system, these factors are left unstated.[7] In either event, the conclusion is unsupported by the reasoning and analysis required under NEPA. Environmental Defense Fund, Inc. v. Froehlke, *supra,* 473 F.2d 346.

*Alternatives*

As previously noted Section 102(2)(C)(iii) of NEPA requires that the EIS include a discussion of "alternatives to the proposed action." *See* C.E.Q. Guideline, § 62(iv), 36 Fed.Reg. 7725 (1971).[8] This requirement, however, should not be employed as a crutch for chronic faultfinding. Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir.), cert. denied, 414 U.S. 1052, 94 S. Ct. 558, 38 L.Ed.2d 341 (1973).

> [T]he requirement in NEPA of discussion as to reasonable alternatives does not require "crystal ball" inquiry. Mere administrative difficulty does not interpose such flexibility into the requirements of NEPA as to undercut the duty of compliance "to the fullest extent possible." But if this requirement is not rubber, neither is it iron. The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research —and time—available to meet the Nation's needs are not infinite. [Natural Resources Defense Council, Inc. v. Morton, *supra,* 458 F.2d at 836] [footnote omitted].

6. Counsel for defendant Wayne County Road Commission suggested that the figure 9,129 was the amount of annual delay *above* the acceptable four minutes/aircraft. The EIS does not indicate what the figures represent other than annual delay in hours. Although there is reference to delay in the Air Quality Section of the EIS (p. 67) neither the information nor the figures there presented explain how delay has been calculated. This Court adopts the comment of the District of Columbia Circuit:

> The subject of environmental impact is too important to relegate either to implication or to subsequent justification by counsel. The Statement must set forth the material contemplated by Congress in form suitable for the enlightenment of the others concerned. [Natural Resources Defense Council, Inc. v. Morton, *supra,* 458 F.2d at 836] [footnote omitted].

7. Mr. Warskow testified that the bar graphs of predicted hourly operations at Metropolitan indicated to him that the existing runway system would be taxed during peak hours, hence this system was approaching saturation. The EIS nowhere suggests that peak hour capacity and demand determined saturation or indicate what hourly demand levels at Metropolitan approach saturation.

8. Senator Jackson in the Section-by-Section Analysis of the Act, reported this language to be a notation for: "[t]he alternative ways of accomplishing the objectives of the proposed action and the results of not accomplishing the proposed action." 115 Cong. Rec. 40420 (Dec. 20, 1969).

Morton, *supra*, at 837] [footnote omitted].

The EIS discusses in some detail four alternatives: building another airport; adding capacity to another airfield in the region; doing nothing; and adding capacity at Metropolitan Airport. In addition, the EIS discusses, in response to comments of the Environmental Protection Agency (E.P.A.), the alternative of a coordinated system of rapid rail service.

Plaintiffs do not maintain that the drafters of the EIS misstated the implications of the considered alternatives. The four alternatives are sufficiently detailed to aid the decision-maker, are supported by the balance of the EIS and adequately assess probable environmental impact so as to comply with NEPA.

In response to an E.P.A. comment, the agency drafters stated that a rapid rail system alternative was not considered because in the time frame of the EIS (1972–1980) there were no plans for a high speed train system linking Detroit with other major metropolitan areas. Plaintiffs offered no evidence to controvert this conclusion which is, on its face, sufficient to render more extensive treatment unnecessary.

The fundamental question raised by plaintiffs concerning the alternatives section of the EIS is the failure to consider three alternatives which they claim deserved consideration: banning general aviation aircraft from Metropolitan and directing them to nearby Willow Run Airport; building additional taxiways to service existing runways; and building a short general aviation runway in lieu of the proposed 10,000′ runway.

An EIS need not discuss all hypothetical alternatives. Plaintiffs must make a showing that alternatives which were not considered are neither remote nor speculative nor have effects which are not readily ascertainable. Natural Resources Defense Council, Inc. v. Morton, *supra*. A reviewing court should limit its inquiry to a determination of whether the responsible agency took a "hard look" at the feasible alternatives. *Id.* at 838. *See generally* Greater Boston Television Corp. v. F.C.C., 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 92 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

The suggestion put forth by plaintiffs' counsel that the drafters should have considered the alternative of constructing additional taxiways is unsupported by evidence. Mr. Warskow testified that at present there is little, if any delay caused by a lack of taxiways. The capacity of the present system, in short, is determined by the number of runways not taxiways.

Charles Van Duesen, project director of the Wayne County Road Commission testified that the alternative of building a short general aviation runway was not considered. He further testifed that he believed such a proposal unfeasible given one of the principal purposes of the runway expansion program: to increase capacity for simultaneous landings when instrument approaches are necessary. A general aviation runway, he testified, even if it met the lateral spacing requirement from the existing instrument runway, would be unusable by air carriers because of its length.

Plaintiffs finally suggest that the alternative of banning general aviation from Metropolitan should have been considered. Dr. Maurice Garbell, plaintiffs' expert on capacity and forecasting, testified that diverting general aviation to another airport was a prudent move from a safety standpoint. He also testified, however, that under present F.A.A. regulations he did not believe it possible to ban a class of aircraft from any airport. There was no testimony that there is any likelihood that this regulation will be modified in the foreseeable future. Under these circumstances the effects of either a voluntary or mandatory diversionary program are uncertain and were understandably not considered.

*Sound*

The EIS contains an extensive section on the sound impact of the proposed runway. Two different methodologies are used. The Aircraft Sound Description System (ASDS) is the basic system used in the EIS.[9] It was developed in the early 1970's by the F.A.A. through its office of Environmental Quality and measures the amount of minutes per day an area is exposed to a sound level of 85dB(A) (A-weighted sound level in decibels) or more due to aircraft noise. This information is portrayed graphically on maps with overlays representing minutes of exposure/acre/day, as well as overlays of sound contours of 85dB(A) or greater for decreasing time durations. A published F.A.A. report fully describing the ASDS methodology is included as an appendix to the statement.

The EIS also contains a tabular summary of the ASDS data for the years, 1972, 1976 and 1980. (Table E–8, p. 64). The table identifies the number of dwellings, population, schools and churches within the contours. Witnesses testified this information came from aerial photographs (EX. 1008). The text of the EIS summarizes and concludes:

> [i]n 1972 the area off the Airport which is exposed for 2 minutes to 15 minutes [85dB(A)] totals 4,678 acres. With the existing runway configuration in 1976, this area is 4,626 acres. By 1980 with the addition of a new runway, the off-Airport area exposed to 85dB(A) or more for 2 minutes to 15 minutes is reduced to 964 acres. Under these same conditions in 1980, it should be noted that no acreage, off-Airport, is exposed for more than 15 minutes. The value of an additional runway in 1976 is demonstrated by a reduction in sound exposure to residential dwellings, people and sensitive buildings when compared to the exposure with the existing runway configuration in 1976.

Although the tabular summaries show that the number of schools exposed to 2 to 15 minutes 85dB(A) is increased from 5 to 9 with the new runway, this fact is not mentioned in the text.

The final draft EIS[10] also contains two Composite Noise Rating (CNR) maps for the year 1980. CNR contours represent the aggregate daily noise exposure at a given point. Unlike the ASDS, all noise levels are taken into account, and, also unlike the ASDS, nighttime noise levels are penalized for their sleep-disturbing effects.

From the CNR data the EIS concludes:

> [a] review of both maps shows that in both cases all of the land zoned residential is outside the 115 CNR contour. In addition, a close examination of the respective 100 CNR contours for the present and proposed runway layouts reveals that the amount of new residential acreage encompassed by the 100 CNR contour with the new runway is more than offset by the amount of acreage zoned residential which drops out by the use of the new runway. Of the new areas which fall within the 100 CNR, no section is expected to exceed two minutes of exposure per day (average) to sound levels above 85dB(A).

Plaintiffs interpose several objections to the ASDS methodology and the CNR data presented:

1.) The choice of 85dB(A) as a threshold of unacceptability is

9. An F.A.A. order of October, 1973, established the ASDS as the basic agencywide method for describing community noise exposure caused by aircraft operations.

10. The preliminary draft EIS contains only ASDS data. The CNR's were added in response to criticism of the Department of Transportation that ASDS data alone was insufficient for land use planning purposes. The F.A.A. in 1974, amended its Aircraft Noise Analysis Requirements by requiring that complementary methods of noise analysis be used in addition to ASDS.

arbitrary and capricious in that it ignores completely what we know about the detrimental effects of noise on man;

2.) Several different noise level contours must be presented in order to adequately assess the acceptability of the noise impact of the proposed runway;

3.) The contours assumed that the existing fleet will be retrofitted with quieter engines in 1980, an unwarranted assumption; and

4.) The CNR data is incomplete. No contours are included for 1972 or 1976, and surrounding land use is not included.

Juan E. Cruz of the Office of Environmental Quality of the F.A.A. was given the responsibility for the implementation of the ASDS. He testified that this new system was developed because existing techniques were misunderstood and misapplied. He stated that the 85dB(A) threshold was chosen because the quality of noise analysis below that level starts to degrade, and because the 85dB(A) contours correspond approximately with both the altitude and the lateral boundaries of airport traffic areas. The F.A.A. Report on ASDS indicates that 85dB(A) represents an indoor awakening threshold level and "the lower bound of monitoring for the recommended occupational safety and health criteria as determined by the Department of Health, Education and Welfare."

Plaintiffs rely on the testimony of Dr. Karl D. Kryter, Director of Sensory Sciences at the Stanford Research Institute. Dr. Kryter was of the opinion that the choice of 85dB(A) as a threshold of unacceptability was highly misleading and did not conform to what is scientifically known about the effect of noise on humans.

The Court concurs with Dr. Kryter's conclusion. While the choice of 85dB(A) may have significance as a measuring standard—sound levels of that magnitude can be reliably segregated and quantified—the rationale for its selection as a maximum level of acceptability for the human environment was not demonstrated either in EIS or the testimony.

The International Organization of Standardization, the E.P.A. and the National Institute of Occupational Safety and Health (N.I.O.S.H.) have established that continuous occupational exposures (40 hours per week) to noise levels of 85dB(A) presents a risk of permanent hearing loss of 25dB(A) to a portion of the population.[11]

It is true that none of the ASDS contours approach a 40-hour per week exposure of 85dB(A) noise. A system, however, which only plots noise levels of a potentially dangerous magnitude, without informing the reader of this fact is misleading.[12]

In July, 1973, the E.P.A. criticized the choice of 85dB(A), as too high a threshold.[13] By postulating 264 daily

11. The estimates of the percentage of the population who will have hearing loss ranges from 10% (International Organization of Standardization) to 12% (E.P.A.) and 15% (N.I.O.S.H.) *See* Proposed OSHA Occupational Noise Exposure Regulation, 39 Fed. Reg. 43802, 43805 (December 18, 1974). (Exhibit 1023)

12. The EIS states that the Occupational Safety and Health Act of 1970 establishes that continuous noise levels of 90dB(A) are unacceptable. The EIS fails to note that N.I.O.S.H. has recognized the need for reducing this standard to 85dB(A). Criteria for a Recommended Standard . . . Occupational Exposure to Noise, 1972. (Cited in Exhibit 1023 at 43802)

Elsewhere the EIS implies that 85dB(A) is an acceptable level. In response to a H.U.D. comment voicing concern over the choice of 85dB(A) as a threshold, the EIS states:

> It is correct the ASDS does not reflect sound pressure levels (SPL) less than 85dB(A) and does not account for sensitivity of the recipient. SPL below 85dB(A) were not considered significant in view of the exposure to SPL in excess of 85dB(A) *and the universal use of 85dB(A) as a baseline SPL.* [emphasis supplied].

13. *Review and Analysis of Present and Planned F.A.A. Regulatory Actions and Their Consequences Regarding Aircraft and Airport Operations.*

flyovers [14] the E.P.A. was able to equate the ASDS with more established composite noise level measurements. The E.P.A. reported that this number of flyovers at 85dB(A) would produce a sound contour of 40 NEF (Noise Exposure Forecast), a level which H.U.D. describes as the borderline between normally unacceptable and clearly unacceptable for residential areas. Kenneth Eldred, an acoustician and vice-president of an acoustical consulting firm, confirmed this conversion. He testified that 15 minutes of exposure to a noise level of 85dB(A) would produce an NEF contour of 40 (± 3dB(A)). ASDS contours show such exposures for significant non-airport areas yet the reader is not informed that these levels have been determined to be unacceptable for residences by the Department of Housing and Urban Development.

The E.P.A. study also estimated that the same number of flyovers would produce a nighttime equivalent level of 75Ldn (a night weighted composite measurement). The E.P.A. has determined that an Ldn of 55dB or greater will produce activity interference and annoyance. Again, this appraisal is not mentioned in the EIS.

A second major deficiency of ASDS is that it fails to use multiple thresholds—noise levels above and below 85dB(A). H.U.D. commented on this omission in the EIS:

—the ASDS does not recognize the impacts of totally unacceptable noise levels, such as those over 100dB(A).

—the ASDS does not recognize impacts of lower, but still significant noise levels, such as those over 65dB (A). It could be expected that such noise levels would pertain over a wide geographic area and would be of long cumulative duration.

In response the drafters state that noise levels below 85dB(A) were not considered significant due to the universal use of 85dB(A) as a baseline sound pressure level. No mention is made of the higher thresholds.

The failure to disclose noise levels above 85dB(A) is the most serious deficiency in the EIS. ASDS contour maps show significant off-airport areas that are and will be exposed to between two and fifteen minutes of noise levels of 85dB(A) or greater. What those noise levels will be, whether 90dB(A), 100dB(A), 110dB(A), etc., is left to conjecture. In the Court's opinion this area deserves the closest scrutiny as to the probable impact of the proposed runway, yet there is no way for the reader to determine from the ASDS data what actual noise levels a person living in this area would be exposed to.

The lack of information of sound levels above 85dB(A) is especially critical in view of the fact that the decibel scale is logarithmic; an increase of 6dB(A) at this level doubles the perceived noise level to the listener. Noise levels much above 85dB(A) may be clearly intolerable for most land uses, but ASDS contours do not reveal where these areas lie. The problem is compounded by the fact that only the net effect of sound is discussed: that the total area exposed at 85dB(A) is reduced with the new runway. The EIS does not quantify the increase in exposure to some areas and the exposure of formerly unexposed areas.

Plaintiffs also question the assumption that in 1980, the existing commercial fleet will be fitted with quieter engines thereby reducing noise levels generally. This assumption is stated several times in the EIS and, based on the evidence presented, is not misleading or unwarranted. The EIS response to an

14. There was no evidence concerning the validity of this assumption for Metropolitan Airport. Based on ATA predictions of 806 and 1060 daily operations in 1975 and 1980, the application of the E.P.A. hypothetical is warranted. Proposed 3R–21L will be used primarily for landing and will be utilized for 30.35% and 26.99% of the total landings at Metropolitan in 1976 and 1980. Using these figures, the operations will exceed the hypothetical number of 264 flyovers.

E.P.A. comment answers plaintiffs' allegation.

It has been demonstrated that the state of the art is advanced to the point that retrofit is viable and reasonable means to provide a reduction in aircraft noise exposure. The FAA has a Notice of Proposed Rule Making which stipulates that by July 1, 1978, the total air carrier fleet must honor sound levels which do not exceed existing Part 36 certification criteria. It is on these very practical retrofit limits that the credits for 1980 have been taken. It is inconceivable that substantial retrofit will not be complete prior to 1980. Further proof of this eventually is offered by the EPA Report of July 27, 1973, on aircraft-airport noise. This Report on Page 111 states that nacelle retrofit is possible within five years.

In requiring complementary sound description systems to be used in conjunction with ASDS, the F.A.A. admitted that no single method has yet been agreed upon to answer all relevant noise questions. *See* footnote 10, *supra.* Both Mr. Cruz and Mr. Eldred testified that while ASDS was not perfect in every respect, it was understandable to the layman—a major improvement over the abstractness of the composite measuring systems.

The criticism of ASDS expressed by Mr. Kryter, and accepted by the Court, goes beyond a mere difference of opinion between groups of scientists as to what noise description methodology is more revealing. The Court does not question the underlying concepts of ASDS as a system of measuring aircraft noise. It is the implementation of that concept, use of only one threshold, and the choice of 85dB(A) as that threshold that renders the analysis deficient.

The inclusion of the two CNR maps for 1980 does not rectify these inadequacies. While the CNR system itself is not subject to the same criticisms as ASDS, because of its inclusion of all sound levels, its presentation in the EIS was less than adequate. There were no CNR contours prepared for the year 1976, so that the impact of the new runway could be studied based on data from the present non-retrofitted fleet. A more basic defect is the total lack of information as to what the CNR contours mean in terms of an acceptable human environment. The non-technical reader should be advised of existing governmental standards, such as the site exposure guidelines of H.U.D.,[15] so that an informed analysis would be possible. As presented in the EIS, the CNR contours are meaningless numbers to the non-scientist with no guidelines to analyze the data presented in terms of acceptability for a human environment.

*Relief*

This Court's determination that Section 102 requirements have not been met does not create a mandatory, blanket right to an injunction. Although the preliminary injunction is the vehicle by which a declared congressional policy can be effectuated, Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164 (6th Cir. 1972), cert. denied 414 U.S. 1036, 94 S. Ct. 535, 38 L.Ed.2d 327 (1973), general principles of equity are applicable in NEPA cases and these principles will control the Court's discretion. Environmental Defense Fund, Inc. v. Froehlke, 348 F.Supp. 338 (W.D.Mo.1972), aff'd 477 F.2d 1033 (8th Cir. 1973).

The four prerequisites for the equitable relief requested are: (1) that a substantial question is at issue; (2) that there is a possibility of success on the merits; (3) that a balancing of injuries to the parties requires preliminary injunctive relief, and (4) that the public interest would be served by such preliminary relief. State of Ohio ex rel.

15. These guidelines state that area between CNR contours of 100 and 115 is "normally unacceptable" for residential building, and area within the 115 CNR contour is "clearly unacceptable".

Brown v. Callaway, 497 F.2d 1235 (6th Cir. 1974); Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970), aff'd, sub nom., Sierra v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

There is little doubt that this is a matter of substantial importance to all parties involved. However, while plaintiffs may be successful in the limited effort to halt this project pending filing of an adequate EIS, is is not equally clear that plaintiffs will enjoy ultimate success in terms of alteration or abandonment of the project. For the purposes of a preliminary injunction, however, plaintiffs have demonstrated a sufficient probability of success on the merits. State of Ohio ex rel. Brown v. Callaway, 364 F.Supp. 296 (S.D.Ohio 1973), aff'd, 497 F.2d 1235, *supra.*

The Sixth Circuit Court of Appeals in Environmental Defense Fund v. Tennessee Valley Authority, *supra* fully explicated the reduced burden of showing irreparable harm in NEPA cases.

> More important, appellants misconceive the purpose of a preliminary injunction in this context. As the court states in Scherr v. Volpe, 336 F.Supp. 882, 886 (W.D.Wis.1971):
>
> > the continuing construction work by the defendants and those working in concert with them, if allowed to continue, will make it impossible to restore the area in question to its previous environmental status. Thus, plaintiffs' rights would be sacrificed before a complete hearing and determination on the merits of their contention. The purpose of granting the preliminary injunction is to preserve the subject matter of this controversy in its existing condition.
>
> In addition, the more time and resources appellants are allowed to invest in this project, the greater becomes the likelihood that compliance with section 102 of the NEPA, and the reconsideration of the project in light of the provisions of section 101, will prove merely to be an empty gesture. Arlington Coalition on Transportation v. Volpe, *supra,* 458 F.2d [1323] at 1327, 1332–1334. Accordingly, "unless the plaintiffs receive *now* whatever relief they are entitled to, there is danger that it will be of little or no value to them or to anyone else when finally obtained." Lathan v. Volpe, 455 F.2d 1111, 1117 (9th Cir. 1971).
>
> Finally, the preliminary injunction, as we stated earlier in this opinion, is the vehicle by which a declared congressional policy can be effectuated. Sufficient irreparable harm, even apart from the considerations discussed above, can be found in the continuing denial by appellants of appellees' right under the NEPA, Izaak Walton League of America v. Schlesinger, 337 F.Supp. 287, 295 (D.D.C. 1971); City of New York v. United States, *supra,* 337 F.Supp. [150] at 160, and this is enough to justify issuing the injunction. Lathan v. Volpe, *supra,* 455 F.2d at 1116–1117. [468 F.2d at 1183–84]

These considerations, and particularly the expressed concern of Congress that the public has a right to be fully informed of the factors determinative of agency decision-making where the environment is concerned, militate in favor of plaintiffs on the last two factors.

In fashioning appropriate injunctive relief under NEPA courts have permitted portions of enjoined projects to be completed. *See, e.g.,* Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806 (E.D.Tenn. 1972), aff'd, 468 F.2d 1164, *supra,* (road surfacing, map making, and reporting activities were allowed to proceed); Conservation Council of North Carolina v. Froehlke, 473 F.2d 664 (4th Cir. 1973) (dam construction and building on cleared land allowed); Environmental Defense Fund, Inc., v. Froehlke, 473 F.2d 346 (8th Cir. 1972) (remand to District Court for decision if contracts could go ahead in face of general injunction); Environmental Defense Fund,

Inc., v. Armstrong, 356 F.Supp. 131 (N. D.Cal.1973), aff'd 487 F.2d 814 (9th Cir. 1973) (planning, ordering and assembling of materials allowed to continue). The bottom-line consideration in these cases is whether the continuing activity will significantly damage or otherwise affect the environment. State of Ohio ex rel. Brown v. Callaway, *supra*, 364 F.Supp. at 299.

Mr. Van Duesen testified that clearing and "grubbing" of the site was virtually complete, that grading was in progress which will be followed by construction of the runway surface. These facts strongly suggest that all work on this project should be enjoined. Unless enjoined the Court, on ultimate review, may be faced with a *fait accompli* insofar as construction of the runway is concerned and although its use could still be effectively enjoined, millions of federal tax dollars will have been spent uselessly if plaintiffs are successful.

The Court, on the present record, however, cannot enjoin the continuation of the total project. Section 102 requirements are limited to "federal actions significantly affecting the quality of the human environment." The 3R–21L project is jointly funded by Wayne County and the federal government. The federal portion is provided under the Airport and Airway Development Act, 49 U.S.C. § 1701 et seq., on a 50% matching basis up to $8.39 million. Local monies have been budgeted from a $69 million bond issue earmarked for general airport expansion.

There was no evidence presented, aside from the grant provisions and the preparation of the EIS itself, as to the role of the federal government in the project. The Court cannot, therefore, conclude that the project is sufficiently "federal" *in toto* to warrant a blanket injunction. *See* City of Boston v. Volpe, 464 F.2d 254 (1st Cir. 1972). NEPA does not encompass local or state projects affecting the environment. If the role of the federal government is severed by injunction until an adequate EIS is prepared, the full directive of Congress will have been met.

Inasmuch as this Court may be called upon to assess the sufficiency of an expanded or amended EIS, it is not inappropriate to consider the necessity of non-agency comment and review.

Although public hearings were held on the draft version of the EIS, there is no language in NEPA which requires formal hearings. Guideline 10(e) of the C.E.Q. Guidelines provides (with relation to obtaining "the views of interested parties"):

> [i]n accord with the policy of the National Environmental Policy Act and Executive Order 11514 agencies have a responsibility to develop procedures to insure the fullest practicable provision of timely public information and understanding of Federal plans and programs with environmental impact in order to obtain the views of interested parties. These procedures shall include, *whenever appropriate*, provision for public hearings . . . [emphasis supplied].

While the public must be allowed the opportunity to comment upon and submit relevant facts bearing upon an expanded EIS:

> [t]he precise procedural steps to be adopted are better left to the agency, which should be in a better position than the court to determine whether solution of the problems faced with respect to a specific major federal action can better be achieved through a hearing or by informal acceptance of relevant data. [Hanly v. Kleindienst, 471 F.2d 823, 836 (2nd Cir. 1972)].

*See* Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973).

Judge Eislele in the sixth memorandum opinion concerning a proposed Army Corps of Engineers' dam retrospectively observed that objecting persons were not limited to NEPA access channels.

But the plaintiffs are not relegated solely to the provisions of the NEPA

in contacting, and attempting to influence, those decision-makers. . . .
Although the impact statement should, within reason, be as complete as possible, there is nothing to prevent either the agency involved, or the parties opposing proposed agency action, from bringing new or additional information, opinions and arguments to the attention of the "upstream" decision-makers even after the final EIS has been forwarded to CEQ. [Environmental Defense Fund, Inc. v. Corps of Engineers, *supra*, 342 F.Supp. at 1217].

However, Section 102 does require the responsible federal official to consult with and obtain the comments of appropriate federal agencies prior to making any detailed statement. In the Court's opinion if any addendum is to be considered a part of the final EIS then it must be subjected to this comment and review procedure. *See* Natural Resources Defense Council, Inc. v. Morton, 337 F.Supp. 170 (D.C.D.C.1972) aff'd, 148 U.S.App.D.C. 5, 458 F.2d 827, *supra*. The Court realizes that this circulation will result in delay, but:

the Section 102 duties are not inherently flexible. They must be complied with to the fullest extent, unless there is a clear conflict of statutory authority. Considerations of administrative difficulty, delay or economic cost will not suffice to strip the section of its fundamental importance. [Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, *supra*, 449 F.2d at 1115].

The Court finds no "clear conflict of statutory authority" or other compelling reason for not complying with this requirement of NEPA.

For the foregoing reasons, plaintiffs' Motion for a Preliminary Injunction is granted. The federal defendants are enjoined from any and all participation in the planning, funding or construction of the proposed runway until the requirements of Section 102 of NEPA are met.